IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:08-CV-00209-BR

| | |
|---|---|
| TATYANA T. IVANOVA-NIKOLOVA, PH.D., <br><br> Plaintiff, <br><br> v. <br><br> EAST CAROLINA UNIVERSITY, <br><br> Defendant. | AFFIDAVIT OF <br> DAVID A. TAYLOR |

NOW COMES David A. Taylor, Ph.D., being first duly sworn, and states the following:

1. I am over 18 years old and am otherwise competent to give this statement.

2. The facts stated in this affidavit are based on my own personal knowledge.

3. I am currently the Department Chair for the Department of Pharmacology and Toxicology in the Brody School of Medicine (BSOM) at East Carolina University (ECU). I have been Department Chair since I started work at ECU on January 1, 2001; I also have an appointment with tenure as Professor in the department. I received my Ph.D. in Pharmacology from West Virginia University, and also completed a Pharmacology Research Associate Training program fellowship while working at the National Institutes of Health (NIH) from 1974–1976. My research focuses on mechanisms of cellular adaptation and how that process impacts the normal physiology of cells and tissues, particularly the manner in which cells and tissues respond to drugs and neurotransmitters.

4. Because I am the Department Chair, I cannot serve on any of the departmental committees. I do, however, attend the meetings of the graduate studies committee, which pertains to all of the graduate students in our department.

5. Dr. Tatyana T. Ivanova-Nikolova began work as a tenure-track Assistant Professor in the Department of Pharmacology and Toxicology on August 1, 1999. At the time she was hired the Department Chair was Dr. Wallace Wooles, the founder of the department and my predecessor. Her initial salary was set at $65,000 per year. At the time she was hired, her "probationary term" (i.e., the university jargon used to denote the time before a faculty member earns tenure and promotion) began July 1, 2000 and ran until June 30, 2007. Her consideration for tenure and promotion was originally set for the 2005–2006 academic year. If a faculty member fails to achieve tenure and/or promotion, he or she is provided a "terminal year" (i.e., academic year 2006–2007 for Dr. Ivanova-Nikolova) during which the faculty member can look for other employment. (Def.'s Exs. 1–2, 18)

6. According to ECU rules, the tenure clock begins July 1 and ends June 30 the following calendar year. If a faculty member begins work even one day later than July 1, his/her tenure clock does not start until the following July 1. As noted above, Dr. Ivanova-Nikolova began work on August 1, 1999, and so her tenure clock began July 1, 2000. Accordingly, Dr. Ivanova-Nikolova had eleven months of employment at ECU to begin her research prior to the start of her probationary term. (Def.'s Ex. 18)

7. In April 2005, Dr. Ivanova-Nikolova sought to add an additional year to her probationary term. She stated the extension of time would enable her to bring external funding to her laboratory and thus comply with the department's tenure and promotion guidelines. According to Dr. Ivanova-Nikolova, her research progress had been slowed because she had not received her full laboratory start-up funds until 2001 and because of the birth of her second child in October 2000. The departmental committee on tenure and promotion considered her request for an additional year and voted unanimously to support it. I also fully supported the extension and forwarded my recommendation to the Dean and Vice Chancellor. In May 2005, the university extended her probationary term until June 30, 2008. Her consideration for tenure was delayed until the 2006–2007 academic year. (Def.'s Exs. 8–10)

8. Considering the eleven months of employment prior to the start of her probationary term, as well as the year-long extension of her probationary term, Dr. Ivanova-Nikolova enjoyed almost two full years beyond the usual probationary period. It also should be noted that the standard period before review for tenure and promotion is five years. For example, Dr. Ivanova-Nikolova's tenure clock initially ran from academic year 2000–2001 until the scheduled start of tenure consideration in academic year 2005–2006. Her additional almost two years—a nearly 40 percent increase beyond the standard period—was a significant boost in time to conduct research, publish papers, and secure external funding for her laboratory. To my knowledge, no other member of the Department of Pharmacology and Toxicology has received a similar lengthening of the tenure clock.

2

9. As will be explained in greater detail below, Dr. Ivanova-Nikolova was denied tenure and promotion in March 2007. Because her probationary term had been extended by a year, her "terminal year" of employment at ECU (i.e., the university jargon used to denote the last year of employment at the university if denied tenure and/or promotion) ran from July 1, 2007 until June 30, 2008.

10. My relationship with Dr. Ivanova-Nikolova was collegial. She was a valued member of the department. Since she was a junior faculty member, and I am the Chair of the department, I was especially mindful to help her when I could. Her laboratory was across the hall from mine. She and her husband, who worked with her, tended to arrive in their laboratory in the mid-morning and leave in the evening. To my observation, she was at ease in the department, quite willing to express herself when she desired.

11. I and my colleagues did our best to assist Dr. Ivanova-Nikolova in her endeavors here at ECU. For example, when she arrived at ECU, she had been promised $65,000 in start-up funds for her laboratory. Although she had received about $50,000 between 1999 and 2000, a substantial amount, the remainder had not been provided to her for reasons that I was not made aware. When I became Department Chair in 2001, I personally secured the remainder of her start-up funds in spite of the fact that the BSOM and ECU were experiencing budget cuts at that time. I tried to be helpful in other ways, as when I was able to assist her with a letter appealing her denial of a National Science Foundation (NSF) grant application. Likewise, when it became apparent that she was struggling to publish papers and to secure external grant funding, I reduced her teaching responsibilities from a modest level to a very low level, in hopes of providing her more time for research.

12. The Department of Pharmacology and Toxicology currently has nine tenured and tenure-track faculty at various levels, two of whom are women. The department also has two non-tenure-track research professors, one of whom is female. For a basic sciences department in a university school of medicine, our three women faculty constitutes an impressive percentage of our faculty. In addition, at the time Dr. Ivanova-Nikolova joined the department, Dr. Ann Sperry was a tenure-track assistant professor. Dr. Sperry left the department to join the Department of Anatomy and Cell Biology in the BSOM, which better suited her research program. We had hoped and expected that Dr. Ivanova-Nikolova would be sufficiently productive to earn tenure and promotion in our department, as well.

13. All faculty members are evaluated on three primary grounds: teaching, service, and research. In the basic sciences, research usually receives the greatest weight. As a junior faculty member in the department, the percentage of weighting for Dr. Ivanova-Nikolova was 25 percent teaching, 10 percent service,

3

and 65 percent research. To ensure junior faculty have sufficient time to research, publish, and secure grant funding, they typically have modest teaching requirements and low service requirements that slowly increase in amount with time. (Def.'s Exs. 3–7, 20)

14. The departmental faculty receives annual evaluations from me, the Department Chair. In her annual evaluations, Dr. Ivanova-Nikolova generally earned a "good" on the scale of excellent, very good, good, fair, and poor. For one year, academic year 2004–2005, she earned a "very good." For two years, academic year 2002–2003 and academic year 2007–2008, she earned a "fair." Her teaching duties were modest, and students consistently rated her below the departmental average (students evaluate on a seven-point scale, requiring a conversion to the annual evaluation's five-point scale that also takes into account other aspects of teaching beyond student opinion of instruction). But her teaching did show some improvement over time. (Def.'s Exs. 25–26)

15. Junior faculty on the tenure track also receive annual "progress toward tenure" letters, written and signed by the Department Chair and reviewed and signed by the chair of the department's personnel committee. I did not prepare a letter for Dr. Ivanova-Nikolova during the 2000–2001 academic year because of my transition to the role of Department Chair in January 2001. However, my first progress toward tenure letter for Dr. Ivanova-Nikolova encompassed the academic years of 2000–2001 and 2001–2002. (Def.'s Ex. 3)

16. By September 2002, Dr. Ivanova-Nikolova's progress toward tenure was a source of concern. From August 1999 until September 2002, she had published no papers. She had submitted only two grant applications for external funding, and had failed to secure them. For her academic year 2002–2003 progress toward tenure, her "progress toward tenure is a growing source of serious concern." Though I and other peer reviewers found her teaching satisfactory, her research productivity was "less than satisfactory." She again had no publications. She had submitted no grant applications. Her level of productivity was "insufficient to maintain the percentage effort that is currently devoted to research." At that point in her career, her "ability to be successful in the promotion and tenure process could be in serious jeopardy unless there [was] a significant increase in effort and success devoted to research and creative activity." Moreover, to achieve tenure and promotion she needed to show "a history of sustained effort and success in publishing and attempts to obtain extramural funding." (Def.'s Exs. 3–4)

17. For academic year 2003–2004, Dr. Ivanova-Nikolova's research productivity had improved but was "still of significant concern with respect to achieving promotion and tenure." Her progress toward tenure was still "a source of concern." She managed to publish one paper. She submitted two grant

4

applications, but failed to receive funding. Although her slightly improved level of productivity was a positive step compared to previous years, it was imperative that she increase her efforts "to generate support for [her] laboratory and publish the results of [her] research." For academic year 2004–2005, her progress toward tenure "continued to improve but remain[ed] a source of concern." She had published a second paper. Her seven grant applications all failed to secure any funding. Her "ability to generate extramural support for [her] research program and [her] general productivity in terms of published manuscripts since [she] began continue[d] to be a source of concern for achieving promotion and tenure." Dr. Ivanova-Nikolova had acknowledged those concerns herself in her request for an extension of her probationary term. For academic year 2005–2006, her progress toward tenure letter noted that even with an additional probationary year, her progress toward tenure "still remain[ed] a source of concern." Her four grant applications failed to secure funding. She submitted one manuscript for publication, but it had not been published. In sum, despite years of encouragement, exhortations, and warnings, from August 1999 through her formal consideration for tenure during academic year 2006–2007, Dr. Ivanova-Nikolova published only two papers and secured zero external funding for her laboratory. (Def.'s Exs. 5–7)

18. A faculty member who seeks promotion and tenure prepares a list of potential external reviewers as well as a personnel action dossier (PAD) in accordance with the provisions of Appendix D of ECU's Faculty Manual. The PAD lists the credentials and accomplishments of the faculty member who has put himself/herself forward as a candidate for tenure and promotion. The PAD includes the candidate's curriculum vitae; education and training; teaching and advising of students; teaching evaluations; research publications, posters, presentations, patents, etc.; grants and proposals for grants; professional and university service; administrative activities; and honors and other noteworthy activity. Also, the department's tenure and promotion committee compiles a separate list of external reviewers. As Department Chair, I then solicit four or five external reviewers from these two lists to submit evaluations of the candidate's research and scholarly activity. Those evaluations are included as part of the PAD as they are received and considered during the deliberations on tenure and promotion. (Def.'s Ex. 18)

19. Under the guidelines in effect at the time Dr. Ivanova-Nikolova was evaluated, a candidate is first considered by the departmental tenure and promotion committee, which makes a recommendation to the department chair. The department chair reviews the PAD and recommendation of the committee, and makes a recommendation to the Dean of the Brody School of Medicine that either concurs with the recommendation of the committee or does not concur. A school-wide BSOM Tenure and Promotions Committee, consisting of nine tenured faculty members from across the various departments in the school, reviews the candidate for tenure and promotion and makes its own recommendation to the

5

Dean. The Dean then reviews the candidate, the recommendations, and the guidelines for tenure and promotion and makes a recommendation to the Vice Chancellor for Health Sciences. If the Vice Chancellor makes a decision not to grant tenure and promotion, that decision is final. (Def.'s Exs. 18–19)

20. The Department of Pharmacology and Toxicology tenure and promotion committee reviewed Dr. Ivanova-Nikolova's candidacy for tenure and promotion. The three members of the committee were Dr. M. Saeed Dar, Dr. Brian McMillen, and chair Dr. Abdel Abdel-Rahman. On 6 November 2006, Dr. Abdel-Rahman provided me the committee's majority recommendation to deny tenure and promotion to Dr. Ivanova-Nikolova. I later was informed the decision was unanimous. (Def.'s Ex. 11)

21. After I informed her of my intention to concur with the recommendation of the departmental committee, Dr. Ivanova-Nikolova asked to include additional information in her PAD, consisting of her list of grant applications to NIH and NSF as well as grant panel summaries of her NSF grant proposals and revisions and an applicant notification to the American Heart Association (AHA). I supported that request and asked the departmental committee to reconsider her candidacy with these additions. They returned the same recommendation to deny tenure and promotion. (Def.'s Exs. 12–15)

22. I reviewed Dr. Ivanova-Nikolova's candidacy very carefully, with the hope to find she had met the criteria for tenure and promotion. The conferral of tenure and promotion is an extremely serious decision for the university. It is not done lightly. As Department Chair, I get a thorough view of the entire department, its strengths and weaknesses, its productivity, research, teaching, grant funding, and service to the university and the profession. I can and must compare faculty members to each other and to the department's guidelines for tenure and promotion.

23. Pursuant to the Department of Pharmacology and Toxicology guidelines for tenure and promotion, a candidate is expected to show excellence in teaching, service, and research. At minimum, the candidate "must demonstrate excellence in at least two categories and satisfactory performance must be demonstrated in the third." For research, the candidate is expected to publish six full-length papers in peer-reviewed journals. The candidate also should have successfully generated external funding to support her research and laboratory for a minimum of three years. Moreover, the candidate should demonstrate progressive funding or significant improvement in priority scores on the grant applications submitted. (Def.'s Ex. 20)

6

24. I closely examined all of the materials and information provided in Dr. Ivanova-Nikolova's PAD, as well as the external review letters. I also reviewed her cumulative productivity over her many years in the department. Her service was small but satisfactory. Her teaching contribution was modest in amount and of lower quality (as determined by student evaluations and my own judgment) than almost every other faculty member in the department; in my opinion, her teaching was not satisfactory for tenure and promotion. Thus, I did not see excellence in either service or teaching. As for research, she had published only two papers, falling well short of the expectation of six published papers. She utterly failed to secure any external funding whatsoever, a consideration not helped by the fact she applied for only two grants during her first three full academic years. Nor had she demonstrated any progressive funding or any significant improvement in scores on her grants from federal agencies. Based on these data, her laboratory and research program were minimally productive and showed little promise of future success. Though she had one more paper written which had not been published, including that paper would only make a total of three papers. She had no external funding secured for the future. Moreover, she had benefitted from almost two full years beyond the normal tenure and promotion period, and still came up far short of the expectations. Comparing her lack of productivity in the long time frame in which it occurred against the department's guidelines, it was clear Dr. Ivanova-Nikolova did not meet the expectations for tenure and promotion.

25. In my professional opinion, Dr. Ivanova-Nikolova had not met the standards for tenure and promotion in the Department of Pharmacology and Toxicology. She did not show excellence in teaching, service, or research. Indeed, neither her teaching nor her research was satisfactory. She was not a strong candidate, and if she were male I would have come to the same conclusion. I made my recommendation against tenure and promotion to Interim Dean and Vice Chancellor Phyllis Horns on 6 December 2006. (Def.'s Ex. 16)

26. Based upon the evidence provided, it was not hard to arrive at my recommendation against tenure and promotion, but it was hard to follow through on it. I understood that a denial of tenure and promotion would have a lasting impact on Dr. Ivanova-Nikolova's career. It is hard to make such a recommendation against a colleague. Nevertheless, on the merits, I had to concur with the committee's recommendation against tenure and promotion.

27. In comparison to Dr. Ivanova-Nikolova, our department has two tenure-track female assistant professors who are establishing strong research programs. Dr. Rukiyah Van Dross began work at ECU on October 1, 2005, and she has published six peer-reviewed papers since her arrival. She came to ECU with external funding from the National Cancer Institute, which provided her more than $655,000 from March 2003 through February 2010. Dr. Van Dross also has

7

received an internal grant of $23,000. A second female assistant professor, Dr. Jamie DeWitt, began work at ECU on July 14, 2008. Since that time, she has published three papers in peer-reviewed journals from work performed at ECU, and three other papers from prior work. On July 1, 2010, she secured an external grant from the Department of Defense for $106,000. She also has received an internal grant from ECU's Division of Research and Graduate Studies to support an undergraduate research project. Both Dr. Van Dross and Dr. DeWitt have published more papers, and secured more external grant funding, than did Dr. Ivanova-Nikolova over a substantially longer period of time.

28.  Dr. Ivanova-Nikolova alleges that I and the departmental committee on tenure and promotion made our recommendations on the basis of her gender, and intentionally discriminated against her. That is absolutely untrue. Her gender played no role in my consideration; if anything, her gender was a factor that worked in her favor. Just because I and the three members of the departmental committee are male does not mean that we made our recommendation on the basis of her being female. Indeed, it was disappointing to me that Dr. Ivanova-Nikolova, a valued member of my department, failed to be sufficiently productive to earn tenure and promotion. Other than being hurt by our decision, she has no basis to allege we discriminated against her. I did not discriminate against Dr. Ivanova-Nikolova on the basis of her gender, and I saw no evidence that my colleagues did so, either. We simply made a merits-based recommendation to Interim Dean and Interim Vice Chancellor Phyllis Horns, who is female and who made the decision for the BSOM.

29.  Currently in our department, two of our four tenure-track assistant professors are female. As Department Chair, I have worked hard to add and retain female faculty in the Department of Pharmacology and Toxicology.

30.  After I made my recommendation to Interim Dean Phyllis Horns, the school-wide Brody School of Medicine Tenure and Promotions committee made its own independent evaluation and recommendation regarding Dr. Ivanova-Nikolova. That nine-member committee had three female members and, as I have been made aware only recently, it unanimously recommended against tenure and promotion.

31.  As both the Interim Dean of the BSOM, and the Interim Vice Chancellor for Health Sciences, Phyllis Horns made the decision for ECU to deny tenure and promotion to Dr. Ivanova-Nikolova. Ordinarily, the Dean of the BSOM makes a recommendation to the Vice Chancellor, but Dr. Horns served in both roles. When a Vice Chancellor recommends granting tenure and/or promotion, that recommendation is forwarded to the Chancellor for further review. Conversely, when the Vice Chancellor decides against tenure and promotion, that decision is final. On March 8, 2007, Interim Vice Chancellor Horns sent a letter to Dr. Ivanova-Nikolova to inform her of the decision denying tenure and promotion. (Def.'s Ex. 17)

32.    I do not believe Dr. Phyllis Horns, or the three female members of the school-wide Tenure and Promotions committee, discriminated against Dr. Ivanova-Nikolova on the basis of her gender when evaluating her candidacy for tenure and promotion. Dr. Horns is a strong supporter of female faculty. It does not make any sense to me that Dr. Ivanova-Nikolova alleges ECU's decision on her tenure and promotion was discriminatory on the basis of gender, when the decision was made by a woman.

33.    Dr. Ivanova-Nikolova alleges the Department of Pharmacology and Toxicology failed or refused to allocate equal departmental resources to her. Her allegation is badly mistaken. In addition to her own salary and the salary of her research technician—who happened to be her husband, Emil Nikolov, in an arrangement she made with the previous department chair before my arrival—she had significant internal funding. She was provided a substantial start-up grant of $65,000 for distribution over her first three years, to help outfit her laboratory as she saw fit. Although about $10,000 of her start-up funds were delayed due to university budget cuts, when I started as Department Chair, I personally secured the remainder of her start-up funds from departmental resources, redirecting those monies to her and away from other priorities. Also, every year I provide each faculty member between $4,000 and $5,000 from the department's funds as operating funds, on a sliding scale with larger amounts provided to faculty who did not have external funding; thus, Dr. Ivanova-Nikolova got the maximum amount available to any faculty member in the department, every year. In addition, the BSOM provided her two additional internal grants totaling $38,898. To my knowledge, during Dr. Ivanova-Nikolova's time in the department, no other professor in the department secured more internal funding.

34.    Beyond the internal funding, Dr. Ivanova-Nikolova was expected to secure external grant funding, just like all the departmental faculty members (and all basic sciences faculty at ECU and other research institutions around the country). Such grants can range from tens of thousands of dollars into millions of dollars. Through her work, Dr. Ivanova-Nikolova should have secured external funding, which would have led to the ability to hire more technicians, attract more students, expand her laboratory, and increase her research. In turn, those increases and expansions would lead to more productivity and more grant funding. Unfortunately, Dr. Ivanova-Nikolova failed to secure any external funding over her entire time at ECU. Overwhelmingly, her grant applications were not only denied, they were not highly enough regarded to earn a "score" from places like NIH to indicate a likelihood of success.

35.    Dr. Ivanova-Nikolova claims she was not allocated equal laboratory space. Her allegation is unarguably wrong. In general, our department has a series of rooms for laboratory space on one floor of a building. The rooms are fixed

spaces and configurations, and space is assigned as it is available. As a faculty member secures external funding and can increase the number of technicians and other personnel in her laboratory, he/she may need more space, which the department does its best to accommodate as space is available.

Dr. Ivanova-Nikolova's laboratory measured 499 square feet, a standard room for the department. She was a junior faculty member who failed to secure any external funding. In comparison, Dr. Brian McMillen has been a tenured faculty member since 1987, and his laboratory is 497 square feet. Dr. M. Saeed Dar, tenured since 1985, has 505 square feet. Both Dr. McMillen and Dr. Dar have and continue to secure external funding. By any measure, Dr. Ivanova-Nikolova's allocation of laboratory space was equal to those tenured male faculty members. Meanwhile, other faculty members, male and female, who had secured external funding found it necessary to expand their laboratories and employ more personnel. If Dr. Ivanova-Nikolova had secured any external funding and sought more space, I and the department would have worked to find space for her to expand. Particularly considering her junior level and lack of any external funding, Dr. Ivanova-Nikolova's allocation of laboratory space was adequate and comparable to senior, externally-funded, male faculty in the department. (Def.'s Ex. 24)

36. As another allegation, Dr. Ivanova-Nikolova claims she was not allocated an equal number of "research assistants," by which she means research technicians. That is ludicrous. Each tenured and tenure-track faculty member has one research technician provided by the department (i.e., from "state funds," as opposed to funds from external grants). The research technicians are distributed across the department as uniformly as possible. As Department Chair, I sometimes have two research technicians, because my administrative duties require a great deal of my time and take me away from my laboratory. When I came to the department, I specifically negotiated with the BSOM to bring my own research technician from my previous university. However, at various times, my second research technician helps fill gaps or needs in the department when they arise by helping in other faculty laboratories. Moreover, Dr. Ivanova-Nikolova had her own husband, Dr. Emil Nikolov, as her research technician. Presumably, she was happy with his work. Given his Ph.D. degree, he had substantially higher credentials than many of our other research technicians, and so it could be argued she had more research assistance provided from departmental funds than some other professors. Besides their one "state-funded" research technician, faculty members with external funding can use some of that funding to pay for the positions of additional research technicians, or sometimes post-doctoral fellows. No junior faculty member in his or her probationary term has ever had more than one research technician funded by the department in the absence of external funding.

37. I am aware that Dr. Ivanova-Nikolova has argued I did not provide an upgrade in job title to her husband, Dr. Emil Nikolov, at the time she thinks was

10

appropriate. In the fall of 2005, Dr. Ivanova-Nikolova asked me to upgrade his job title from a Research Technician 2 to a Research Technician 3. It should be noted from the outset that this position "upgrade" only consisted of a changed job title. It did not entail an increase in salary as funds were not available at that time to support an increase in salary. I put forward that request to ECU's human resources department, but was informed it could not take place until after the university-wide career banding took place. The career banding took until February 2007, during which time the request for a Dr. Nikolov's upgrade was put on hold. As a result of the career banding, Research Technician 3s were now called Research Specialists, and Research Technician 2s were now called Research Technicians. Because of the lapse in time, I simply forgot to reinitiate the position upgrade with the human resources department. However, Dr. Ivanova-Nikolova also failed to remind me about her request. She never mentioned it again, until June 2007 during her internal university grievance after being denied tenure and promotion. Regardless, I did not intend to deny Emil the position upgrade, which I actually supported and requested to have completed. I simply forgot to reinitiate it after a long time elapsed. Moreover, when requesting and then forgetting the position upgrade, I did not discriminate against Dr. Ivanova-Nikolova on the basis of her gender.

38.     Dr. Ivanova-Nikolova alleges she was not "allocated" graduate students to work in her laboratory. Apparently, she views graduate students as departmental resources, and not as students to be educated. She claims the department discriminated against her by "failing or refusing" to allocate these students as workers for her laboratory. Her claim is without merit. The department does not "allocate" or direct graduate students to work in particular laboratories. In their first year, the graduate students rotate through the department's laboratories to get a sense of the types of work each laboratory performs. At the end of the first year, I and Dr. M. Saeed Dar, the department's director of graduate studies, meet with the first-year students to explain they will be choosing a laboratory where they will work for the next three or four years as they develop their theses and conduct their research. They must have a good "fit" with the laboratory. Their doctoral theses are extremely important for their future careers, and they must choose the laboratory where they think they will best be able to complete their work.

39.     The graduate students are not directed toward any laboratory, but instead give their first, second, and third choices. They almost always receive their first choice. Infrequently, they cannot have their first choice, if more than one graduate student from the same year picks the same laboratory or because a laboratory is too full. If so, the student will receive her second choice. To my knowledge, during the time that Dr. Ivanova-Nikolova was in the department, no student has failed to get either their first or second choice. The department does not force graduate students to work in particular laboratories. The students are

11

choosing their own career paths and research interests, and our educational mission is to help and enhance that process, not to deter it. Thus, the graduate students are not "allocated" to particular laboratories, but instead simply make their own choices about the best environment in which to pursue their theses and develop their careers.

40. The entire departmental faculty, including Dr. Ivanova-Nikolova, participates in a meeting to review the graduate students' choices, with an open discussion. To my knowledge, during the time that Dr. Ivanova-Nikolova was a faculty member, the department has always unanimously decided to let every student work in the laboratory he or she chose. I do not recall any time that Dr. Ivanova-Nikolova, or any other faculty member, objected to this decision.

41. None of the male or female graduate students chose to work in Dr. Ivanova-Nikolova's laboratory. One student did rank her laboratory as a second choice, but the student received her first choice. At no point in time did I, Dr. Dar, or anyone in the department discriminate in any manner to prevent graduate students from choosing Dr. Ivanova-Nikolova's laboratory.

42. Dr. Ivanova-Nikolova alleges she was purposefully excluded from graduate student thesis committees. Once again, her allegation is without merit. Our department averages two or three new graduate students each year. After their first two years, they formulate a thesis and research plan, with guidance from their thesis advisor. After conferring with his/her thesis advisor, the graduate student picks three or four faculty members he/she desires to have on the thesis committee, at least one of whom is not from the department. The advisors do not direct or insist that certain departmental faculty be included on a thesis committee. If a particular faculty member is not a good fit for the thesis, or the student is not comfortable with certain faculty, then the student is not forced to include such a person on his/her committee. No male or female graduate student picked Dr. Ivanova-Nikolova for inclusion on her thesis committee.

43. For comparison purposes, Dr. Donald Barnes, a senior tenured faculty member (now Emeritus) in the department, did not serve on a graduate thesis committee during his several decades in the department.

44. Dr. Ivanova-Nikolova was not harmed by escaping service on graduate thesis committees. For tenure and promotion purposes, thesis committee participation falls under service, and not teaching and research. I deemed her service to be satisfactory, as did the departmental tenure and promotion committee. Thus, my recommendation for tenure and promotion was wholly unaffected by the fact that Dr. Ivanova-Nikolova did not participate on a graduate thesis committee.

12

45. In paragraph 5.b. of her Complaint, Dr. Ivanova-Nikolova alleges she received less than 50 percent of the "state-funded resources" provided to a male assistant professor in the department. That is false. From her discovery responses, I understand that paragraph 5.b. refers to Dr. Ken Soderstrom, who was an Assistant Professor in the Department of Pharmacology and Toxicology at the time Dr. Ivanova-Nikolova worked in the department. Though she has failed to specify precisely what resources or her basis of calculation, her allegation is false. Both Dr. Ivanova-Nikolova and Dr. Soderstrom had one research technician provided by the department at the time of appointment, so their "state-funded resource" of research technicians was equal. Unlike Dr. Ivanova-Nikolova, however, Dr. Soderstrom secured a significant external grant that allowed him to hire an additional research technician from his grant funding and expand his research program. As to internal funding for their laboratories, Dr. Soderstrom never received an internal grant, while Dr. Ivanova-Nikolova received two internal grants worth a total of $38,898. In addition, due to his external funding, the department funds allotted to Dr. Soderstrom for laboratory support were reduced according to the sliding scale and never reached the same levels that were provided to Dr. Ivanova-Nikolova. Furthermore, both Dr. Ivanova-Nikolova and Dr. Soderstrom received the same initial laboratory space, with Dr. Soderstrom at 496 square feet and Dr. Ivanova-Nikolova at 499 square feet. When Dr. Soderstrom secured external funding, however, he expanded his laboratory and personnel and I accommodated his expansion with a second room for his laboratory (his laboratory space increased from one room of 496 square feet to two rooms with a total of 983 square feet). Dr. Soderstrom earned his external grant funding and put it to use by expanding his lab. Accordingly, Dr. Ivanova-Nikolova received an equal share of state-funded resources compared to Dr. Soderstrom. She simply failed to secure any external grant funding to keep up with his success. (Def.'s Ex. 24)

46. Dr. Ivanova-Nikolova contends she faced a hostile work environment because on one occasion she found a freezer partially unplugged. In the freezer, Dr. Ivanova-Nikolova kept purified signaling proteins. On the evening of June 23, 2001, Dr. Emil Nikolov found the freezer partially unplugged and the temperature risen, which she says caused her progress to slow due to the need to re-test the catalytic activity of the signaling proteins. In a memorandum dated June 27, 2001, she requested that the department install a box with a lock be placed around the power outlet. The box that would have been installed was a wire cage which would not have prevented someone from unplugging a freezer cord. None of the freezers in the department have such lockboxes. Since this was as an isolated incident, I did not see the need for the expense of installation of such a lockbox, particularly at the time our department was experiencing budget reversions (i.e., budget cuts) and we were looking for ways to reduce expenses. Instead, because my laboratory is directly across the hall from the location of the freezer room, I began to monitor the freezer and the people who went in the room. Moreover, I let Dr. Ivanova-Nikolova

13

address the faculty regarding her concern about the freezer. Furthermore, Dr. Ivanova-Nikolova did not lose her signaling proteins, but if she had, the department would have paid for the replacement cost of those proteins. As it happened, we had no further incidents with the freezer, partially unplugged or otherwise. (Def.'s Ex. 22)

47. Dr. Ivanova-Nikolova contends the freezer must have been unplugged maliciously, to harm her. However, she neglects to mention that her laboratory and my laboratory evenly split the use of the freezer, and that I also had materials (brain and other tissues) in that same freezer. The freezer was kept in a common store room with eight other freezers. The room has a lot of daily traffic from personnel in various laboratories in the department. Dr. Ivanova-Nikolova admits she does not know who unplugged our freezer. She also admits she does not know the motivation of whoever unplugged the freezer. She simply alleges it was hostilely done to her by the department, to harm her research. But it is possible and perhaps probable that the freezer was accidentally unplugged. It is possible that someone from outside the department partially unplugged the freezer. It is possible that a student, or a visitor, or a janitor partially unplugged the freezer. And it is possible that the freezer was partially unplugged to harm my research or harass me, the new department chair. I saw absolutely no evidence that the freezer was unplugged to create or maintain a hostile work environment against Dr. Ivanova-Nikolova, or to harass her in any way.

48. In another allegation, Dr. Ivanova-Nikolova alleges I participated in creating or maintaining a hostile work environment by momentarily "obstructing" one lecture she made to a class of physician assistant students in the fall of 2001. Her allegation is mistaken. She alleges that I and two other professors from the department, Dr. Donald Barnes and Dr. Abdel Abdel-Rahman, attended this lecture and one of us made a statement that "intruded" on her lecture. She points to a single sentence written months later, in April 2002, by a sole anonymous student in her course evaluations, which said a faculty member was "very disrespectful in a comment he made" to Dr. Ivanova-Nikolova. But she does not identify the specific lecture where this allegedly occurred, or which faculty member allegedly made the comment. She does not provide the comment itself, or even explain how it "obstructed" her lecture. To my knowledge, no other student took any kind of notice of such an alleged "obstruction." To my knowledge, no other student made any similar comment on his or her course evaluation. Dr. Ivanova-Nikolova admits that she did not hear the comment that allegedly "obstructed" the lecture. (Def.'s Ex. 23)

49. I do not recall any lecture given by Dr. Ivanova-Nikolova where I, Dr. Barnes, and Dr. Abdel-Rahman were all present. In the fall of 2001, Dr. Barnes served as the course coordinator for that physician assistant course, and it was his practice to attend the lectures of all the professors who lectured in the course. I was

14

a relatively new department chair, and I sometimes attended lectures by the faculty in my department. I do not recall Dr. Abdel-Rahman being present as an observer of this physician assistant course. Regardless, I am confident that neither I, Dr. Barnes, Dr. Abdel-Rahman, nor any other professor in the Department of Pharmacology and Toxicology, intentionally "obstructed" a lecture by Dr. Ivanova-Nikolova. On occasion, faculty observing a class may ask a question of the lecturing professor, or perhaps add a clarifying point. But such participation is minimal and not done maliciously. During the times I observed lectures given by Dr. Ivanova-Nikolova, no faculty member made any "disrespectful" statement to or about her, or any comment which "obstructed" a lecture. I saw no evidence that a hostile work environment was created or maintained by any comment "obstructing" a lecture given by Dr. Ivanova-Nikolova.

50. Dr. Ivanova-Nikolova never raised any allegation of discrimination or hostile work environment until after she was denied tenure and promotion. Other than the freezer, she never brought any of the issues or concerns described above to me or to others in the department or BSOM. Having no knowledge of her concerns, I had no chance to investigate them or take any action to alleviate her concerns of discrimination or hostile work environment.

51. On March 8, 2007, Interim Vice Chancellor Phyllis Horns notified Dr. Ivanova-Nikolova of her decision to deny tenure and promotion. As part of the university's grievance procedures, Dr. Ivanova-Nikolova then initiated an appeal, alleging gender discrimination and personal malice. She named as respondents to her appeal me and Drs. Abdel-Rahman, Dar, and McMillen. On June 4 and 5, 2007, a faculty hearing committee held two days of hearings on the denial of promotion and tenure. On June 7, 2007, the faculty committee informed ECU's Chancellor, Dr. Steve Ballard, of its recommendation that the evidence did not support Dr. Ivanova-Nikolova's allegations of gender discrimination and personal malice. On August 17, 2007, Chancellor Ballard notified Dr. Ivanova-Nikolova that ECU would not conduct further review of the decision to deny tenure and promotion.

52. On August 24, 2007, Dr. Ivanova-Nikolova appealed ECU's decision to The University of North Carolina Board of Governors. By letter dated January 11, 2008, the Board of Governors, without deciding the issue, set aside ECU's decision and directed ECU to conduct a second hearing to focus on the issue of gender bias and discrimination. On February 29 and March 1, 2008, ECU's faculty hearing committee again held a hearing on the allegations. The hearing committee concluded the evidence did not support the allegations made by Dr. Ivanova-Nikolova, informing Chancellor Ballard of its recommendation on March 3, 2008. By letter dated March 31, 2008, Chancellor Ballard notified Dr. Ivanova-Nikolova that no further review would be made.

15

53. On May 16, 2008, Dr. Ivanova-Nikolova again appealed to The University of North Carolina Board of Governors. After its review, the Board of Governors upheld the decision by ECU on November 14, 2008, determining that Dr. Ivanova-Nikolova had failed to carry her burden of proof on gender bias discrimination.

54. On August 27, 2007, Dr. Ivanova-Nikolova filed her Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). The EEOC issued its right to sue letter on September 30, 2008.

55. Having been denied tenure and promotion, Dr. Ivanova-Nikolova's "terminal year" of employment at ECU ran from July 1, 2007 until June 30, 2008. On May 16, 2008, I provided her with her completed annual evaluation for that academic year. Though she was required to submit an "annual report" to me prior to my completion of the annual evaluation, she failed to do so, and so I collected whatever data I could. She finally submitted her annual report on May 21, 2008, after my annual evaluation was issued. In the evaluation, I assessed her work that year to be "fair." Her teaching had been reduced to a very modest level. She had declined to teach a course in the spring semester. Though her teaching was of acceptable quality, it was so small in quantity that I rated it only "fair" in comparison with the rest of the department. Her service contributions continued to be very modest, which I judged to be "fair." As for research, she did publish one paper during that academic year, while submitting only one grant application and failing to secure any external funding. I evaluated her research to be "good." Overall, in comparison to all of her colleagues in the department, I judged her work that year to be "fair." (Def.'s Ex. 25)

56. Dr. Ivanova-Nikolova alleges her annual evaluation of "fair" for the 2007–2008 academic year was retaliation for filing a complaint with the EEOC. That is false and absurd. Of primary importance, I evaluated Dr. Ivanova-Nikolova fairly in light of her low contributions that year. In my professional judgment, having evaluated the entire department every year since 2001, she earned a "fair" rating. I did not retaliate against her for the EEOC filing, about which I had little knowledge or involvement, and which had occurred many months prior to the evaluation. Although I was informed of the EEOC filing, others at ECU handled the university's response. Moreover, I had no reason or desire to retaliate. Her annual evaluation for academic year 2007–2008 was pro forma; it had no practical effect. She had already been denied tenure and promotion. She was near the completion of her terminal year at ECU, and would be leaving the institution by June 30, 2008. The annual evaluation had no effect on her employment at ECU, which was almost finished. She had previously received an evaluation of "fair" for the 2002–2003 academic year. Her work in 2002–2003—when she had a higher teaching load, similar service, and prepared one manuscript—was similar to the

2007–2008 academic year. I simply did not retaliate against her for the EEOC filing, about which I was not concerned and gave no thought. (Def.'s Exs. 25–26)

57.  I did not discriminate against Dr. Ivanova-Nikolova on the basis of her gender, or on any other basis. Nor did I create or maintain a hostile work environment, harass, or retaliate against Dr. Ivanova-Nikolova. All of her allegations are without merit.

58.  I do not believe, and I saw no evidence, that anyone within the Department of Pharmacology and Toxicology or anyone within the BSOM and ECU discriminated against Dr. Ivanova-Nikolova, created or maintained a hostile work environment, harassed, or retaliated against her.

The foregoing affidavit is a true statement related to *Ivanova-Nikolova v. East Carolina University*, Case No.: 4:08-CV-209BR, and based on my own personal knowledge.

_____
David A. Taylor

Sworn to and subscribed before me this 4th day of November 2010.

_____
Notary Public

My Commission expires: 9/28/2013