IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:08-CV-00209-BR

TATYANA T. IVANOVA-NIKOLOVA, PH.D.,

    Plaintiff,

v.

EAST CAROLINA UNIVERSITY,

    Defendant.

AFFIDAVIT OF
ABDEL A. ABDEL-RAHMAN

NOW COMES Abdel A. Abdel-Rahman, Ph.D., F.A.H.A., being first duly sworn, and states the following:

1. I am over 18 years old and am otherwise competent to give this statement.

2. The facts stated in this affidavit are based on my own personal knowledge.

3. I am a Distinguished Professor of Pharmacology in the Department of Pharmacology and Toxicology in the Brody School of Medicine (BSOM) at East Carolina University (ECU). I received my Ph.D. in Pharmacology from Leeds University, England. In 1982, I came to ECU as a visiting scientist, and began as a tenure-track assistant professor in March 1985. I earned tenure and promotion in 1989. My research focuses on cardiovascular pharmacology and the central regulation of blood pressure. I am a Fellow of the American Heart Association.

4. I have had the opportunity to serve on many departmental committees, including the personnel committee, the graduate studies committee, and the tenure and promotion committee. In addition, I have served on departmental search committees for faculty recruitment. I also serve as vice-chair of our department.

5. Dr. Tatyana T. Ivanova-Nikolova and I enjoyed a very collegial relationship. We talked regularly. I highly valued her as a scientist and as a member of our department. I did my best to mentor her in an informal way, as I have and continue to do with other junior faculty in the department.

6. When I had the chance to help Dr. Ivanova-Nikolova, I did so. For example, I have had excellent success in securing external grant funding, and I have had the opportunity to serve on and chair study sections for the National Institutes of Health (NIH), which includes a great deal of reading and critiquing grant applications. When Dr. Ivanova-Nikolova asked me for advice on her grant applications, I responded by answering her to the best of my ability. I suggested she should consider seeking smaller grants first, such as NIH's R21 or R03 grants, instead of the larger and more competitive grants like NIH's R01 grants. The R21 and R03 grants are smaller grants which last two years, instead of R01 grants that typically run for five years and have much higher monetary amounts. By first securing R21 and R03 grants, applicants work their way up and provide reassurance and ammunition for grant reviewers to assign outstanding scores for R01 grants. A number of our junior faculty have accepted similar advice and submitted R21/R03 applications or submitted applications for grants targeting new investigators. Dr. Ivanova-Nikolova followed my advice, though she was unable to secure even one of those lesser grants. I also agreed to help edit and provide feedback for writing an appeal for one of her grant applications to the National Science Foundation (NSF). I suggested the "right" language to use in the appeal and how to avoid alienating reviewers. At other times, when I felt I was not the best source to advise her on particular issues, I directed her to specific colleagues who I thought could give her better assistance.

7. I have served on the Department of Pharmacology and Toxicology's tenure and promotion committee since 1994. I have been the chair of the departmental tenure and promotion committee since 1999.

8. At the time Dr. Ivanova-Nikolova sought tenure and promotion during the 2006–2007 academic year, the members of the departmental committee were myself, Dr. Saeed Dar, and Dr. Brian McMillen.

9. As the chair of the departmental tenure and promotion committee, my role is to ensure we follow the departmental and university guidelines for tenure and promotion. For every faculty candidate we seek to be fair and impartial. Candidates compile a personnel action dossier (PAD) pursuant to Appendix D of ECU's Faculty Manual. (Def.'s Ex. 18) The PAD includes, among other things, the candidate's curriculum vitae; her teaching assignments and evaluations; a full listing of her published articles, presentations, posters, patents, and so on; external grants and proposals for grants; service to the university and other professional service; any administrative roles she handles; and other honors or activities. In addition, the departmental committee compiles a list of external reviewers, which includes names suggested by the candidate and the committee members. A group of four or five external reviewers are asked to submit evaluations of the candidate's research, and then those evaluations are considered in the tenure and promotion review.

2

10. Once all this information is compiled, the candidate is informed that the PAD is now complete and asked if he or she wishes to add any supplemental material. The PAD is reviewed by each member of the departmental tenure and promotion committee. After the individual review, the departmental committee meets to consider tenure and after deliberating and voting on a tenure recommendation, the same process is repeated for promotion, in accordance with Appendix D. We carefully examine the candidate's contributions to teaching, research, and service, with a thorough discussion on each of these areas. At the end of the committee's deliberations, we cast sealed votes that are seen only by the chair of the committee.

11. We followed this process for reviewing Dr. Ivanova-Nikolova's candidacy for tenure and promotion. Her candidacy did deviate from the norm, however, because she received almost two full years more than the probationary term defined in Appendix D for achieving tenure and promotion.
Dr. Ivanova-Nikolova started her employment in the Department of Pharmacology and Toxicology in the beginning of August 1999. Because the university's rules require the tenure clock to begin on July 1 of each year, if a faculty member starts even one day later (e.g., July 2), her tenure clock does not start until the following July 1. Thus, Dr. Ivanova-Nikolova had eleven months of employment at ECU before her tenure clock started July 1, 2000. (Def.'s Exs. 1–2) Second, in April 2005 Dr. Ivanova-Nikolova sought to add an additional year to her probationary term. Under university jargon, this was an extension of her probationary term. (Def.'s Ex. 8) A "probationary term" is the series of two- and three-year renewable contracts that all junior (tenure-track Assistant Professor) faculty work under before they seek tenure and promotion. It is imperative to note that in her request to be granted the one-year extension, Dr. Ivanova-Nikolova indicated she needed the extension to meet the departmental guidelines for tenure and promotion by publishing papers and securing external grant funding. The departmental tenure and promotion committee received Dr. Ivanova-Nikolova's request for an extension. Though this request was the first and only such request in the history of our department, we promptly considered her request and voted unanimously to support it. Accordingly, she was granted an extra year before consideration of tenure, until the 2006–2007 academic year. (Def.'s Exs. 9–10) Thus, Dr. Ivanova-Nikolova benefitted from almost two full years beyond the usual probationary period.

12. The departmental tenure and promotion committee met twice at the beginning of November 2006 to consider Dr. Ivanova-Nikolova's candidacy, one time to consider tenure and a second time to consider promotion from assistant to associate professor. As a practical matter, it is rare that a candidate would receive tenure and not promotion, or vice versa.

3

13. The Department of Pharmacology and Toxicology guidelines on tenure and promotion provide expectations for a candidate's teaching, service, and research. For Dr. Ivanova-Nikolova, the percentage weighting of these areas was 25 percent for teaching, 10 percent for service, and 65 percent for research. Obviously, the research criteria were the most important consideration for tenure and promotion. Dr. Ivanova-Nikolova's service was satisfactory for a junior faculty member, and her teaching was uneven but improving. So, I will focus here on the research criteria, where she was severely deficient. The department's guidelines set an expectation for a candidate to publish six full-length papers in peer-reviewed journals during the probationary term. The candidate also should have obtained external funding to support her research and laboratory for a minimum of three years, and should demonstrate progressive funding or significant improvement in priority scores on the grant applications submitted. (Def.'s Ex. 20)

14. After meticulous evaluation of her candidacy, I voted against recommending tenure and promotion for Dr. Ivanova-Nikolova. While she met the expectations for service, I saw clear deficiencies in the research arena and, to a lesser extent, in the teaching arena. Although the quality of her research was high, her number of publications for the entire probationary period was much below expectations. She produced only two published papers, rather than the expected six papers, despite the extension of her probationary term as discussed above. She also had a complete lack of funding from external grants, when the expectation was a minimum of three years of external funding. We even considered her grant applications, almost all of which failed to garner a "score" from NIH indicating the applications were not considered meritorious by the NIH study sections. There were no prospects for external funding on the horizon. As for her teaching, it appeared to be improving, though her student evaluations were below the departmental averages. In my judgment, though her presentations to graduate students were good, she would have had a great challenge in teaching medical students. After a series of lectures to medical students, which left the students frustrated and lost, the department decided it would be in the best interests of the medical students to have her not teach those lectures again. Overall, the deficiencies in Dr. Ivanova-Nikolova's candidacy far exceeded the strengths.

15. Drs. Dar and McMillen each submitted a sealed vote to me on the questions of promotion and tenure at the conclusion of the meetings. They both voted against recommending tenure and promotion to Dr. Ivanova-Nikolova. Thus, the departmental committee recommendation to deny tenure and promotion was unanimous. On 6 November 2006, I forwarded this departmental committee recommendation to Department Chair David Taylor via a form memorandum. (Def.'s Ex. 11)

4

16. On December 1, 2006, Dr. Ivanova-Nikolova asked to include additional information in her PAD, consisting of her list of grant applications to NIH and NSF as well as grant panel summaries of her three NSF grant proposals and an applicant notification to the American Heart Association (AHA). The departmental tenure and promotion committee reconsidered her PAD in light of these additions, and made the same recommendation to deny tenure and promotion. (Def.'s Exs.12–15)

17. Recommending not to grant tenure and promotion was a painful decision for me. We searched for measurable positives to overcome the deficiencies, hoping to find reasons to find her research program satisfactory. But her laboratory was not sufficiently productive and failed to earn any external funding. Ultimately, we could not find enough to recommend tenure and promotion. As I noted above, I valued her work as a scientist and a colleague, and I regret she did not earn tenure. I sincerely wish her credentials were in line with the departmental guidelines.

18. Dr. Ivanova-Nikolova alleges our departmental tenure and promotion committee discriminated against her because she was female. That is not true. In fact, I viewed her gender as a plus because there are far fewer female than male biomedical scientists in academic institutions. Undoubtedly, I would make the same decision on tenure and promotion if Dr. Ivanova-Nikolova was male, and so would my departmental colleagues. Tenure is a long-term commitment from the university, and the candidate must demonstrate a long-term benefit in return. A candidate with little success over seven years does not bode well for the future. At the BSOM, every tenured professor, male and female, who examined her PAD came to the same conclusion. At least fourteen men and women with tenure—the departmental committee, the department chair, the school-wide BSOM Tenure and Promotions committee, and the Interim Dean/Vice Chancellor Phyllis Horns—reviewed her candidacy for tenure and promotion, and all recommended denial.

19. As a contrast to Dr. Ivanova-Nikolova, when I was a candidate for tenure and promotion, I had at least fifteen published papers and had secured a five-year NIH grant. My teaching was rated outstanding. Indeed, I earned tenure in only four years. I had no graduate students assist me, and only one research technician.

20. Dr. Ivanova-Nikolova alleges I participated in creating or maintaining a hostile work environment by briefly "obstructing" one lecture she made in a class of physician assistant students. Allegedly, this occurred in Fall 2001. She claims I attended her lecture with Dr. Donald Barnes and Department Chair David Taylor. She refers to a single comment written in April 2002 by one anonymous student in her course evaluations, which said a faculty member was "very disrespectful in a comment he made" to Dr. Ivanova-Nikolova. But neither the student nor

5

Dr. Ivanova-Nikolova specify which lecture, when the lecture occurred, or which faculty member made this comment. Indeed, we do not even know the content of this solitary "comment." (Def.'s Ex. 23)

21. I do not recall attending any lecture in 2001 by Dr. Ivanova-Nikolova, and I had absolutely no reason, and no time, to attend any lecture by her in the fall of 2001. I was not the course director for the course, so I had no reason to attend the lectures by other professors. In her time in the department, I only attended one lecture she presented to medical students because it preceded the lectures I gave on a related topic. I most certainly did not make an obstructing or disrespectful comment during that lecture. It is not in my nature or demeanor to do so. Moreover, I am sure no faculty member intended to obstruct or embarrass Dr. Ivanova-Nikolova during a lecture. Her allegation against me is baseless.

22. Dr. Ivanova-Nikolova also complains she did not get an "equal" share of resources, but her claims are without any merit. As should be kept in mind, junior faculty without tenure usually receive more resources (start-up funds) and less commitment to teaching and service early in their careers, compared to senior faculty with tenure. Furthermore, in addition to her start-up funds, she received two internal grants from the BSOM. The first of those internal grants was given for one year. Then, as the chair of the BSOM research committee at that time, I made her aware she was eligible for applying for and obtaining a second-year grant, which she did. Where Dr. Ivanova-Nikolova fell short was in securing <u>external</u> funding, whether federal grants or otherwise. To my knowledge, her internal grant funding was much higher than any other tenure-track faculty in our department.

23. In another allegation, Dr. Ivanova-Nikolova claims she was excluded from participating on graduate student thesis committees. Her allegation is false. Neither I nor any of my colleagues sought to exclude her from these committees. Indeed, far from seeking to exclude her, I asked at least one student to seriously consider including her as a member of his thesis committees. The student I asked declined to include her, not feeling comfortable working with her. Regardless, participation in graduate student thesis committees plays no role in consideration for tenure and promotion, and I do not see how she was harmed by being relieved of the additional burden on her time and energy that these committees entail.

24. Dr. Ivanova-Nikolova further alleges she was not "allocated" graduate students to work in her laboratory. But the graduate students rotate through the department's laboratories during their first year, and then they submit their top picks for the laboratory in which they would like to work. Students generally get either their first choice, or at least their second choice. Only one graduate student ever picked Dr. Ivanova-Nikolova's laboratory, as a second choice, and he received his first choice.

6

25.     I had a somewhat similar situation for many years, with no graduate students assigned to my laboratory, despite the wish of some students to join my lab. While I was a junior faculty member (Assistant Professor) without tenure, graduate students were assigned to laboratories by the former chair of the department, Wallace Wooles. Graduate students started to come to my lab after significant changes were made to our graduate program and specifically to a change in the process of assigning students to the laboratories of their choice. Regardless of the reason, I had no graduate students before I obtained tenure and <u>two</u> promotions (from Assistant to Associate Professor and then to Professor). Thus, I went for the first twelve years of my career as a faculty member in the department without having a graduate student in my laboratory.

26.     I did not discriminate against Dr. Ivanova-Nikolova on the basis of her gender. In fact, I viewed her gender as a plus and not a detriment, as discussed above under paragraph 18. I also did not harass her or retaliate against her. Our department's recommendation to deny her tenure and promotion was made on the merits, and not on the basis of gender.

27.     To my knowledge, no one in the Department of Pharmacology and Toxicology, or at ECU, discriminated against Dr. Ivanova-Nikolova. Also, to my knowledge, no one harassed her, created or maintained a hostile work environment, or retaliated against her.

28.     Furthermore, it saddens me that Dr. Ivanova-Nikolova makes all of these allegations, but never once raised any of the allegations or issues until after she was denied tenure and promotion in Spring 2007. Though she claims she suffered from gender discrimination or gender harassment, she never once brought those concerns to the attention of the department or the Brody School of Medicine.

7

The foregoing affidavit is a true statement related to *Ivanova-Nikolova v. East Carolina University*, Case No.: 4:08-CV-209BR, and based on my own personal knowledge.

_____
Abdel A. Abdel-Rahman

Sworn to and subscribed before me this 5th day of November 2010.

_____
Notary Public

My Commission expires: 9/28/2013