IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:08-CV-00209-BR

TATYANA T. IVANOVA-NIKOLOVA,        )
PH.D.,                              )
                                    )
            Plaintiff,              )
                                    )
     vs.                            )
                                    )
EAST CAROLINA UNIVERSITY,           )
                                    )
            Defendant.              )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

COPY

DEPOSITION

OF

TATYANA T. IVANOVA-NIKOLOVA, PhD

At Raleigh, North Carolina                    Reported by:
August 9, 2010 - 10:05 a.m.        Candi R. Uselman, RPR, CRR

# capitalreporting

PO Box 97696          8320 Falls of Neuse Road      919.841.4150 ph
Raleigh, NC 27624     Suite 111                     919.841.4155 fax
                      Raleigh, NC 27615

www.capreporting.com                    main@capreporting.com

RECEIVED
AUG 25 2010
N.C. DEPT. JUSTICE
EDUCATION SECTION

1               A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3          Tatyana T. Ivanova-Nikolova

4          PRO SE

5          3431 Kilburn Circle, Apt. 522

6          Richmond, Virginia 23233

7          nikolovs4@verizon.net

8

9    FOR THE DEFENDANT:

10         Brian R. Berman

11         Special Deputy Attorney General

12         Gary R. Govert

13         Assistant Attorney General

14         NORTH CAROLINA DEPARTMENT OF JUSTICE

15         114 West Edenton Street [27603]

16         Post Office Box 629

17         Raleigh, North Carolina 27602

18         (919)716-6900

19         (919)716-6763 Fax

20         bberman@ncdoj.gov

21         ggovert@ncdoj.gov

22

23

24

25

T A B L E   O F   C O N T E N T S

EXAMINATION - ATTORNEY                                          PAGE

Direct - Berman                                                   5


EXHIBITS                                                        PAGE

Defendant's 1    5/5/99 letter from Dr. Wooles to               41
                 Dr. Ivanova-Nikolova

Defendant's 2    7/29/99 letter from Dr. Hallock to            44
                 Dr. Ivanova-Nikolova

Defendant's 3    9/27/02 letter from Dr. Taylor to             50
                 Dr. Ivanova-Nikolova

Defendant's 4    5/23/03 letter from Dr. Taylor to             53
                 Dr. Ivanova-Nikolova

Defendant's 5    4/27/04 letter from Dr. Taylor to             57
                 Dr. Ivanova-Nikolova

Defendant's 6    4/22/05 letter from Dr. Ivanova-             64
                 Nikolova to Dr. Taylor

Defendant's 7    4/29/05 letter from Dr. Taylor to             65
                 Dr. Ivanova-Nikolova

Defendant's 8    EEOC Charge of Discrimination                 98

Defendant's 9    5/16/08 Memorandum from Dr. Taylor           103
                 to Department of Pharmacology and
                 Toxicology Faculty

Defendant's 10   5/21/08 letter from Dr. Ivanova
                 Nikolova to Dr. Taylor

Deposition of Tatyana Ivanova-Nikolova, PhD

1    EXHIBITS, cont'd                                    PAGE

2    Defendant's 11   2002-2003 Faculty Evaluation      113

3    Defendant's 12   Department of Pharmacology         174

4                     Research Space breakdown

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, Candi R. Uselman, Registered Professional

2     Reporter and Notary Public in and for the state of North

3     Carolina, was appointed commissioner by consent to take

4     the deposition of TATYANA T. IVANOVA-NIKOLOVA, PhD on

5     August 9, 2010 at 10:05 a.m. at the offices of The North

6     Carolina Department of Justice located at 114 West

7     Edenton Street, Raleigh, North Carolina.

8     _____

9     Whereupon,

10          TATYANA T. IVANOVA-NIKOLOVA, PhD,

11    having first been duly sworn, was examined and testified

12    as follows:

13    DIRECT EXAMINATION

14    BY MR. BERMAN:

15    **Q:**     Thank you for being here, and do you

16    understand we're here today to take your deposition?

17    **A:**     Uh-huh.

18              THE REPORTER:  Yes?

19    **A:**     Yes.

20              THE WITNESS:  I'm sorry.

21    **Q:**     I'm sorry, and you'll have to --

22    **A:**     I need -- okay.

23    **Q:**     -- answer the questions out loud too because

24    our court reporter just has to have a verbal response.

25    **A:**     Okay.

1   recommended for funding, and this information was

2   provided also.

3        Q:    Okay.

4        A:    And there was a recommendation of the panel

5   that it was the particular type of experiment to be

6   completed, and this was provided to them.  They couldn't

7   fund it because the levels of the agency dropped

8   considerably below their expectations.

9        Q:    Okay.  But you had not received any external

10  funding?

11       A:    I didn't receive it, yes, although the

12  application was recommended for funding by the panel.

13       Q:    Okay.  But from 1999 through November 2006,

14  you had not received any --

15       A:    No.

16       Q:    -- external funding?

17       A:    No.

18       Q:    Now, the tenure and promotion committee of

19  your department made a recommendation, and they made a

20  recommendation to the chairman; is that correct?

21       A:    That's correct.

22       Q:    They don't make any mention of your gender in

23  their recommendation, correct?

24       A:    No.  This was very short memoranda that was

25  three sentences each, I believe.

1    **Q:**    Okay.  But you are contending that their

2    decision or their recommendation was gender

3    discrimination?

4    **A:**    Yes.

5    **Q:**    What evidence do you have that says that that

6    recommendation was gender discrimination?

7    **A:**    There were many occasions that I felt that

8    they just look at me and they see a shell and they are

9    treating me in a different way than they treat the male

10   colleagues.  And all of this were provided in my response

11   to your set of interrogatories.

12   **Q:**    Okay.  Thank you, and we've gotten that, and I

13   appreciate that.

14   **A:**    Would you like me to go --

15   **Q:**    Well, we can go through a lot of the incidents

16   in a little bit, but I'm trying to find out -- none of

17   them told you that they were denying you or recommending

18   denying you tenure on the basis of your gender?

19   **A:**    There was not a direct statement.

20   **Q:**    Okay.  This is your interpretation?

21   **A:**    This is my interpretation.

22   **Q:**    Okay.  Now, the department granted you an

23   extra year for tenure.  Was that discriminatory?

24   **A:**    This extension was granted because when I

25   joined the department, your first exhibit is -- is it the

1    first exhibit or it was an attached -- there is the

2    second letter that is specifying the amount of funding

3    that is going to be provided.  And it is not in this

4    letter, but I have the second letter that is identifying

5    the amount of startup funds that the department is going

6    to provide to me.  And the department didn't provide the

7    funding that was given to me as startup funding.  A

8    portion of this fund was withheld for two or three years.

9        Q:    Okay.

10       A:    So this was one of the grounds that I

11   requested the extension.  And the second was the fact

12   that I had young children.

13       Q:    Okay.  But when they granted it to you, that's

14   not discriminatory, correct?

15       A:    No, this is not discriminatory.

16       Q:    Now, the members of your tenure committee, how

17   many members were there?

18       A:    There were three.

19       Q:    And do you remember which professors they

20   were?

21       A:    Yes.  The chair of the personnel committee is

22   Dr. Abdel-Rahman, and the other two are Dr. Dar and Dr.

23   McMillen.

24       Q:    So that's Brian McMillen and Saeed Dar?

25       A:    Yes, Dr. Saeed Dar.

1    to a male colleague that was in the similar situation

2    like mine.  So therefore, I contend that he was

3    discriminating based on my gender.  Because another

4    colleague that was started in the department in 2002 and

5    was a male colleague, Ken Soderstrom, he was receiving

6    faster and broader resources, state-funded resources,

7    than the resources that the chairman provided to my

8    laboratory, although I requested the resources.

9        Q:    Dr. Taylor testified that he didn't make the

10   decision based upon your gender.

11       A:    There are vast social studies indicating that

12   when people are asked directly, they denied having any

13   prejudice and biases, but they act upon their biases and

14   their prejudice.

15       Q:    But he testified that he did not make the

16   determination based upon your gender, correct?

17       A:    He testified, yes.

18       Q:    Okay.  But you don't believe it?

19       A:    That's correct.

20       Q:    So David Taylor is the department chair, --

21       A:    Yes.

22       Q:    -- and he makes a recommendation to Phyllis

23   Horns?

24       A:    That's right.

25       Q:    Who's the interim dean of Brody School of

1    Medicine?

2        **A:**      That's correct.

3        **Q:**      And Dean Phyllis Horns is a female, correct?

4        **A:**      Yes.

5        **Q:**      Okay.  Dean Horns, as the dean, makes the

6    decision about whether or not you should be granted

7    tenure and promotion, correct?

8        **A:**      Yes.

9        **Q:**      Okay.  And her decision is final, except that

10   you can appeal it to the faculty grievance?

11       **A:**      That's correct.

12       **Q:**      Okay.  And she reviews the tenure

13   consideration, the PAD that you submit, and the

14   recommendations that are made by the department chair and

15   by the department promotion and tenure committee, and

16   there's also an advisory committee to the dean; is that

17   correct?

18       **A:**      Yes.

19       **Q:**      Okay.  So the other groups, the departmental

20   level groups and this advisory committee are making

21   recommendations to her, but she's the decision -- she

22   makes the final decision as dean, correct?

23       **A:**      Yes.

24       **Q:**      Okay.  When did she make her decision?

25       **A:**      I believe in March of 2007.

1     Q:     That sounds right to me.

2     A:     But I don't have the letter in front of me.

3  This letter is also included with my documents.

4     Q:     And what did she decide?

5     A:     She concurred with the decision of the

6  committee and the chair.

7     Q:     Okay.  Now, her decision didn't make any

8  reference about your gender, correct?

9     A:     No.

10    Q:     Okay.  And as a woman, you're not contending

11 that she was discriminating against you as a woman,

12 correct?

13    A:     I contend that she didn't review properly my

14 credentials as all people that were involved in the

15 review of my credentials starting from the tenure

16 committee.

17    Q:     When you say she didn't review your

18 credentials, she had your PAD, correct?

19    A:     Yes.

20    Q:     And she reviewed it?

21    A:     Yes.  And this PAD had sets of external peer

22 evaluators that were given the same guidelines for tenure

23 and promotion that are the guidelines for tenure and

24 promotion in the department, and they were asked to

25 review my research productivity and -- let me see --

1     **Q:**     I understand.

2     **A:**     And during the hearings, the members of the

3     tenure and promotion committee, Dr. Dar, Dr.

4     Abdel-Rahman, and Dr. McMillen, they all testified that

5     they are not experts in my area of research.

6     **Q:**     But Dean Horns -- you're not contending that

7     Dean Horns as a woman is discriminating against you based

8     on being a woman, are you?

9     **A:**     I don't know why she reviewed my PAD in the

10    way that she did it.

11    **Q:**     You testified previously that you do not think

12    she was discriminating against you?

13    **A:**     I don't know her decision was based on what,

14    and therefore, I requested the reviews of the -- Dean

15    Horns is supposed to rely her review on the reviews

16    provided by the Brody committee for tenure and promotion.

17    **Q:**     Right.  But it doesn't really make sense that

18    Dean Horns, a woman, is discriminating against you on the

19    basis of you being a woman?

20    **A:**     I don't know what makes sense and what doesn't

21    make sense.

22    **Q:**     Do you --

23    **A:**     I don't know the answer to this question.

24    **Q:**     Do you believe that Dean Horns was

25    discriminating against you on the basis of your gender?

1    **A:**    Whether they discriminated based on my gender,

2    whether they wanted to please their colleagues in the

3    Department of Pharmacology, I -- I don't know.

4    **Q:**    Okay.  So you don't know, so therefore, you're

5    not making an allegation, then, that they discriminated

6    against you on the basis of gender?

7    **A:**    Exactly.  I do not allege that they

8    discriminated, but I don't know what was driving their

9    decision before I see some written documents out of their

10   work.

11   **Q:**    But you got written documents from the tenure

12   and promotion committee at the departmental level, and

13   the chairman's recommendation, --

14   **A:**    Yes.

15   **Q:**    -- and those didn't include anything about

16   your gender, so why would these documents have something

17   different?

18   **A:**    Because, again, I -- this review should have

19   been independent of the review provided by the -- the

20   review provided in the department.  And the review that

21   was made in the department, there were two hearings that

22   dealt with how this review was conducted.  There is no

23   information from the review and work of the schoolwide

24   Brody School of Medicine committee.

25   **Q:**    Okay.  But at this point in time, you're not

Deposition of Tatyana Ivanova-Nikolova, PhD

1    **Q:**    And they request annual satisfactory

2    evaluations?

3        **A:**    They request the performance evaluations.

4    **Q:**    Okay.  And when did you start your job at VCU?

5        **A:**    My job at VCU started, as I said, the

6    beginning of September of 2008.

7    **Q:**    And when did you get that job?

8        **A:**    I beg your pardon?

9    **Q:**    When did you get that job?

10       **A:**    I don't have the document with the job offer.

11   It was -- it was before my starting date, obviously.  I

12   don't remember the exact date.

13   **Q:**    Give us an estimate, please.

14       **A:**    After -- my interview date was after the my

15   last day at East Carolina University.

16   **Q:**    Okay.  So it was after June 30th, --

17       **A:**    That's right.

18   **Q:**    -- 2008?  Okay.  So between July and August

19   you interviewed and got the job?

20       **A:**    Yes.

21   **Q:**    Okay.  And this annual evaluation didn't have

22   any impact on that?

23       **A:**    I am not aware whether Dr. Logothetis

24   requested information from my previous employers.

25   **Q:**    Okay.  So who wrote this 2007/2008 annual

1    activities as faculty members.

2         **Q:**    Okay.  So your annual evaluation, which is

3    Exhibit 9 that you received --

4         **A:**    Yes.

5         **Q:**    -- from Dr. Taylor, does it say anywhere that

6    you received a "Fair" because of your gender?

7         **A:**    Again, I would like to refer you to the

8    definition in the policy of East Carolina University.

9         **Q:**    I understand the definition, but my question

10   is, does this 2007/2008 annual evaluation refer to your

11   gender at all?

12        **A:**    It doesn't refer to my gender.

13        **Q:**    And does it refer to the EEOC?

14        **A:**    It doesn't.

15        **Q:**    Okay.  So what evidence do you have that your

16   filing with the EEOC led to Dr. Taylor giving you this

17   2007/2008 annual evaluation?

18        **A:**    My evidence is based on the numbers that you

19   see in this evaluation.  For Teaching he's given me

20   "Fair," numerical equivalent 2.5; for Research/Creative

21   Activity he's given me qualitative evaluation "Good" and

22   numerical equivalent 2.5; and for Service he's giving me

23   "Fair" qualitative evaluation and numerical equivalent

24   2.5.  And these are the words, and this is just the

25   translation.  And "Fair" is 2, and "Excellent" is 5,

1    **A:**    And for a person at my level, the guidelines

2    are stating that it's not expected even to be involved in

3    peer evaluation of other people's publications and

4    grants, and I have been approached from several journals

5    and granting agencies that give grants to provide peer

6    evaluations of other people's work.

7        **Q:**    Okay, I understand.  But what -- but you don't

8    have any evidence from Dr. Taylor that he's giving you

9    this evaluation in response to the EEOC complaint?

10       **A:**    This is, again, the unfair -- unequal

11   evaluation of my performance.

12       **Q:**    Well, I understand that you contend that it's

13   unfair, but you don't have any evidence that Dr. Taylor

14   is doing this because of the EEOC complaint?

15       **A:**    These are even lower.  There were constant

16   deviations from my performance and my evaluations

17   throughout the years.  I never get overall "Fair"

18   evaluation before.

19       **Q:**    Okay.

20       **A:**    And this is the year when we published the

21   second JBC paper, the one that has implications for the

22   treatment of congestive heart failure.

23       **Q:**    Okay.

24       **A:**    That is a major problem for East North

25   Carolina.

1     **Q:**     Okay.  And what did he say?

2     **A:**     He probably -- he switched.

3     **Q:**     Switched topics?

4     **A:**     Probably, yes.

5     **Q:**     Okay.  Are you aware that it's not illegal to

6     ask about pregnancy during an interview?

7     **A:**     I beg your pardon?

8     **Q:**     Are you aware that it's not illegal to ask

9     about pregnancy or having children in an interview?

10    **A:**     This was his phrasing of the question, "I know

11    that it is illegal to ask you about that, but I'm going

12    to ask you anyway.  Do you have plans to have more

13    children?"

14    **Q:**     Okay.  But are you --

15    **A:**     I am not aware of whether it's legal or not.

16    **Q:**     Okay.

17    **A:**     This was his phrasing of the question to me.

18    **Q:**     And do you have any evidence that Dr. Barnes

19    discriminated against you on the basis of that comment?

20    **A:**     Again, I would like to refer to the

21    definitions of the East Carolina University, equal

22    treatment.  I have all the reasons to believe that I was

23    not equally treated.  And who contributed to this?  There

24    were decisions that were made, not at faculty meetings,

25    with the distribution of the lab space, with the

1    **Q:**    Okay.

2    **A:**    I just don't remember on the top of my head

3    without the letter.

4    **Q:**    And was the plug all the way out of the

5    socket?

6    **A:**    No.

7    **Q:**    It was partly unplugged?

8    **A:**    It was partially unplugged.

9    **Q:**    And who found it unplugged?

10    **A:**    My husband found it.

11    **Q:**    Who unplugged the freezer?

12    **A:**    I wish to know.

13    **Q:**    Are you saying you don't know who unplugged

14    the freezer?

15    **A:**    I don't know who unplugged the freezer.

16    **Q:**    Okay.  You didn't lose your signaling

17    proteins?

18    **A:**    The temperature, because we called the

19    security, the temperature was minus one degree.  This is

20    just the point of freezing and thawing.

21    **Q:**    I understand.  But you didn't lose them?

22    **A:**    I found that I didn't lose them after

23    extensive testing.  I wrote that I had to spend -- we had

24    to spend close to six months testing and retesting the

25    activity of these proteins.

1      **Q:**      Okay.  And did Dr. Taylor also use that
2  freezer?

3      **A:**      We provided space in this freezer to him as a
4  gesture of goodwill because he didn't have a freezer when
5  he came to the department.

6      **Q:**      Okay.

7      **A:**      And this was a gesture of goodwill to him.  We
8  offer him space in the freezer that we had.

9      **Q:**      Okay.  So did he have materials in the freezer
10  at the same time you did when it was unplugged?

11      **A:**      He testified during the hearing that he had
12  some brain tissue.

13      **Q:**      Okay.  So why was the freezer unplugged?

14      **A:**      During the hearing and during other
15  conversations, it became apparent that Dr. McMillen was
16  working in the University of Texas, and when Dr. Gilman
17  became the new chairman of the department where he was
18  previously employed, Dr. McMillen had to find another
19  position, and then he came to East Carolina University.
20  And I don't know how this is connected, but there was a
21  remark during the hearing off the record that I -- I
22  heard about the G-proteins, and I don't know who
23  unplugged it though.

24      **Q:**      Okay.  So we don't know who unplugged the
25  freezer, correct?

1     **A:**    That's correct, yes.

2     **Q:**    So we don't know then why it was unplugged?

3     **A:**    The why is easy. I believe that it was an

4  attempt to slow the progress of my research. Because

5  before that incident, I had to two presentations, one in

6  the Department of Pharmacology, I believe, and another in

7  a different department where we were presenting the first

8  data coming out of the lab, and we were making

9  significant progress in our research program. So I

10  believe that the things are connected, and this was done

11  in an attempt to slow our progress.

12     **Q:**    By whom?

13     **A:**    You are asking me -- I can tell you what

14  motivates my actions. I cannot tell you what motivates

15  other people actions. Science is a very competitive

16  field. There are people that are trying to slow your

17  progress in any way possible. Most of the time these are

18  your direct competitors. I don't think that somebody was

19  trying to directly compete with me. It was -- I

20  interpreted this as an attempt to set us back, because

21  these proteins are practically irreplaceable in what we

22  do.

23     **Q:**    But if you don't know who unplugged it,

24  there's no way for you to know why it was unplugged?

25     **A:**    Well, freezers do not unplug themselves on

1    their own.

2        **Q:**    Okay.  But a freezer had been previously

3    unplugged somewhere else in the department, correct?

4        **A:**    Yes.

5        **Q:**    And that wasn't your freezer?

6        **A:**    This was -- I have no knowledge about the

7    incident.  You are referring to an incident that Dr.

8    McMillen was referring to during the hearing.  I'm not

9    aware of this incident, and I don't know what happened.

10       **Q:**    Okay.

11       **A:**    There was a different case when a repairman

12   came to service one of the freezers of Dr. Jamal Mustafa

13   and decided that he is going to take the freezers out of

14   the emergency supply and plug them to the regular supply.

15   And his line of thinking was that the emergency supply

16   experienced some fluctuations that are dangerous for the

17   compressors of the freezers.  What he didn't notice is

18   that the regular power supply is not actually powered.

19   So all the freezers that he went on and switched from

20   emergency supply to regular supply were left out of

21   power.  But at that time, this was caught very early so

22   the temperature was minus 50, or something like that.

23       **Q:**    Okay.

24       **A:**    And this was brought to the attention that

25   this shouldn't be touched.  That is the reason that these

1    was discussing with the students.

2        **Q:**    Okay.  And what was the comment or comments

3    that were made?

4        **A:**    They were trying to -- I don't know what they

5    were trying to do.

6        **Q:**    What did they say?

7        **A:**    I didn't hear exactly what they said.  They

8    were sitting at the back of the room, and this is lecture

9    classroom, and they were sitting next to the window at

10    the back of the room and they were talking -- I even

11    don't know how to say this in English, hecklers, or

12    people that during performance they try to intrude.

13        **Q:**    What did they say?

14        **A:**    I don't -- I didn't hear their comment.

15        **Q:**    Okay.  So how do you know that they were

16    heckling if you didn't hear them?

17        **A:**    They were talking loud enough to be heard in

18    the classroom.

19        **Q:**    But not by you?

20        **A:**    I was engaged in answering the questions of

21    the students.

22        **Q:**    So you don't know what they said?

23        **A:**    I didn't hear exactly what they said.  It was

24    a comment regarding what I was teaching to students.

25        **Q:**    And when you say it was a comment regarding

1    what you were teaching to students, what was the comment?

2        A:    It was something in the sense that I don't

3    need to give them these details or something, but this is

4    what I can gather.  I didn't focus on this.

5        Q:    Gathered from where?

6        A:    From what I overheard while talking to the

7    students.  I was addressing questions of the students at

8    that time.

9        Q:    So you did overhear, or you did not overhear

10   it?

11       A:    I heard the common sense of what they were

12   saying, that I shouldn't give the students that much

13   information or something in that sense.  But I cannot be

14   absolutely positive because my attention was focused on

15   the students' questions.

16       Q:    Okay.

17       A:    And I don't know why they were present during

18   my lecture.

19       Q:    Were they evaluating you?

20       A:    It was not peer evaluation.  My peer

21   evaluation was during the previous year, and they came

22   unannounced to my lecture.  I certainly didn't have a

23   meeting with them after that, and I was not given any

24   indication why they were present during that lecture.

25       Q:    Okay.  So when did you -- so essentially, they

1    **Q:**    Sure.  This is Dr. Dar?

2    **A:**    Dr. Dar, yes.

3    **Q:**    Okay.  What do you --

4    **A:**    So he told me twice that the place of a

5    married woman is in her home in his faith.

6    **Q:**    Okay.

7    **A:**    And he's the one that is the religious leader

8    of the mosque in Greenville.

9    **Q:**    And what was his first comment?

10    **A:**    The first comment was related to his wife.  I

11    testified about this during the hearing.  It was the

12    first social gathering that we had after I joined the

13    department, and this was the first gathering that some of

14    the spouses were at.  And it was a type of cocktail

15    party.  And as we were walking, I asked Dr. Dar whether

16    his wife is there so he can introduce me to her.  And he

17    said that in his faith the place of a woman is in her

18    home, of a married woman is in her home.  And he, after

19    that, denied this, but he reiterated this statement later

20    during another conversation regarding his daughter-in-law

21    and --

22    **Q:**    So if we can just stay on the first comment.

23    **A:**    Sure.

24    **Q:**    So that first comment was at a social

25    gathering?

1   hearing.

2       **Q:**     Okay.  Pakistan, of course, has had a female

3   prime minister?

4       **A:**     I know that.

5       **Q:**     Okay.

6       **A:**     That was killed.

7       **Q:**     Yes.  So Dr. Dar was making a statement about

8   his faith and culture?

9       **A:**     He was -- I didn't really think about this

10  until I was faced with the decision that they presented

11  to me.

12      **Q:**     The decision in 2006 --

13      **A:**     Yes.

14      **Q:**     -- or 7?

15      **A:**     Yes.

16      **Q:**     Okay.  So --

17      **A:**     The denial of the tenure and the promotion.

18      **Q:**     Okay.  So that's the next time that it came to

19  mind?

20      **A:**     Yes.

21      **Q:**     Okay.  And were you -- I mean, you find it

22  offensive for him to talk about his own culture or his

23  own religion?

24      **A:**     No.  I don't find it offensive, but I believe

25  that this is an indication of bias against women in

1    general and me in particular.

2         Q:    So you think the comment was about you, or the

3    comment was about his wife?

4         A:    The comment was the first occasion regarding

5    his wife, and the second time regarding his

6    daughter-in-law.

7         Q:    Okay.

8         A:    And in the second time, I really didn't --

9         Q:    Let me just stay on the first time.

10        A:    Okay.

11        Q:    So the first time -- this comment that we've

12   been discussing for the last minute or two, --

13        A:    Yes.

14        Q:    -- he was saying that about his wife?

15        A:    Yes.

16        Q:    Okay.  Not about you?

17        A:    No.

18        Q:    Okay.  So not about you, your place being in

19   the home?

20        A:    No.

21        Q:    Okay.  The second statement that he made

22   was -- when was that, and what was that statement?

23        A:    This was I don't remember the year.  It was

24   the year when his son and daughter-in-law and they had an

25   infant child were living in their house in Greenville,

1    and he was upset about the young couple, that according

2    to him and his wife, they were not properly feeding the

3    infant and the infant was left hungry.  And while he was

4    telling me this happening, I -- he made the comment that

5    these young people, because they have college degrees

6    they think that they know everything.  And this is when I

7    asked him about the profession of his daughter-in-law and

8    her education.  I knew that his son was in the medical

9    school, in the Brody School of Medicine.  And this is

10   when he said that in his faith the place of a married

11   woman is at home with her children regardless of her

12   education.

13        **Q:**    Okay.

14        **A:**    So --

15        **Q:**    But she did have a college degree, right?

16        **A:**    According -- yes, this is how it started.

17        **Q:**    Okay.

18        **A:**    It was his indication that because they have

19   college degrees, they think that they know everything.

20        **Q:**    Okay.  And she taught at a Montessori school?

21        **A:**    This is coming from his testimony.  He

22   testified that she's a certified Montessori teacher --

23        **Q:**    Okay.

24        **A:**    -- during the hearing.

25        **Q:**    Okay.  And he made that statement about his

1     daughter-in-law?

2          A:     In-law, yes.

3          Q:     And you -- how did that affect you?

4          A:     The way how it affects me is his testimony

5     that was during the hearing, he started talking about a

6     conversation with me in which he advised me to be more

7     welcoming and less intimidating to the students, and he

8     was telling the committee that he felt that the students

9     are intimidated by me.  And there was a line of

10    questioning whether this is about the research that we do

11    in the lab or about me personally, and his answers were

12    that he felt that I am intimidating, that no student told

13    him that, but this is his personal feeling, and he

14    perceived the research in the lab as intimidating.  And

15    all of this is indication that he had problems with

16    accepting me as a colleague, and because he on three

17    occasions indicated to the committee that no student told

18    him that; --

19         Q:     Okay.

20         A:     -- this was his perception of me.

21         Q:     Okay.

22         A:     This is his thinking.

23         Q:     Okay.  But his statement about his

24    daughter-in-law, that's not about you?

25         A:     The statement was about his daughter, yes.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

C E R T I F I C A T E

I, Candi R. Uselman, notary public/court reporter, do
hereby certify that the above-named was duly sworn or
affirmed prior to the taking of the foregoing deposition;
and that said deposition was taken and transcribed under
my supervision; and that the foregoing pages, inclusive,
constitute a true and accurate transcription of the
testimony of the witness.

I do further certify that the persons were present as
stated in the caption.

I do further certify that I am not of counsel for or
in the employment of either of the parties to this action,
nor am I interested in the results of this action.

This is the 23rd day of August , 2010 .

Notary Public #200833600021