UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:08-CV-209-BR

TATYANA T. IVANOVA-NIKOLOVA, PH.D.,    )
                                       )
                Plaintiff,             )
                                       )
        v.                             )        ORDER
                                       )
EAST CAROLINA UNIVERSITY,              )
                                       )
                Defendant.             )


This matter is before the court on the 1 December 2010 motion for summary judgment

filed by defendant East Carolina University ("ECU") and on ECU's 4 March 2011 motion to

strike plaintiff's surreply brief and exhibits.  The motions are now ripe for disposition.

## I.  BACKGROUND

Plaintiff Tatyana T. Ivanova-Nikolova ("plaintiff") began her employment at ECU on 1

August 1999 as a tenure-track Assistant Professor in the Department of Pharmacology and

Toxicology in the Brody School of Medicine ("BSOM").  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 2,

DE # 43-3; D. Taylor Aff., DE # 37-2, ¶ 5.)[1]  Assistant professors at ECU are granted

"probationary appointments" for a "probationary term."  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 1,

DE # 43-2, at 8-9; ECU's Mot. Summ. J., Ex. 18, DE # 37-25, at 7-8; D. Taylor Aff. ¶ 5.)  ECU

---

[1] Plaintiff, who is proceeding *pro se*, does not present a statement of facts in her affidavit in response to
ECU's motion for summary judgment.  She also does not provide a detailed factual background in her complaint.
Thus, it is difficult to distill the relevant background facts from the documents filed by plaintiff in this case.
Although all inferences are to be drawn in favor of plaintiff because she is the non-moving party with respect to the
motion for summary judgment, in many instances ECU has provided specific information about the tenure review
process and about plaintiff's conduct during the course of her employment with ECU.  Plaintiff has neither
responded to nor denied these facts.  As a result, many of the following facts, which are undisputed by plaintiff, are
taken from the affidavits and exhibits attached to ECU's motion for summary judgment.  See Fed. R. Civ. P. 56(e)(2)
(2011) (stating that "[i]f a party . . . fails to properly address another party's assertion of fact as required by Rule
56(c), the court may . . . consider the fact undisputed for purposes of the motion"); Weathers v. Univ. of N.C., No.
1:08-CV-847, 2010 WL 4791809, at *1 n.2 (M.D.N.C. Nov. 18, 2010).

must inform a professor whether he or she will be recommended for tenure at least twelve months before the end of the probationary term.  (Id.)

Because ECU's rules require the "tenure clock" to begin on 1 July of each year, a faculty member who starts even one day later (e.g., 2 July) does not start his or her tenure clock until the following July.  (A. Abdel-Rahman Aff., DE # 37-4, ¶ 11; D. Taylor Aff. ¶ 6.)  Accordingly, plaintiff's probationary term commenced on 1 July 2000 and was scheduled to end on 30 June 2007, with consideration for tenure and promotion scheduled for academic year 2005-2006. (Pl.'s Aff. Resp. Mot. Summ. J., DE # 43, at 2; ECU's Mot. Summ. J., Ex. 2, DE # 37-9; D. Taylor Aff. ¶ 5.)  Thus, plaintiff had eleven months of employment to begin her research before her tenure clock started.  (A. Abdel-Rahman Aff. ¶ 11; D. Taylor Aff. ¶ 6.)

Plaintiff's candidacy was evaluated pursuant to the Department of Pharmacology and Toxicology's tenure guidelines.  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 4, DE # 43-5; ECU's Mot. Summ. J., Ex. 20, DE # 37-27; P. Horns Aff., DE # 37-1, ¶ 19; D. Taylor Aff. ¶ 23; M. Dar Aff., DE # 37-6, ¶ 11.)  Faculty in ECU's Department of Pharmacology and Toxicology are evaluated for tenure and promotion on the basis of research, teaching, and service, with research being the most heavily weighted.  (A. Abdel-Rahman Aff. ¶ 13; D. Taylor Aff. ¶ 13.)  To ensure that junior faculty members have enough time for research, their teaching and service duties are kept low.  (D. Taylor Aff. ¶ 13.)  As a junior faculty member, the percentage of weighting for plaintiff was 25 percent teaching, 10 percent service, and 65 percent research.[2]  (A.

---

[2] Plaintiff appears to dispute the percentages that ECU allocated to each of these three areas (see, e.g., Letter to EEOC, DE # 18-3, at 2; Pl.'s 3/12/08 Letter to Chancellor Ballard, DE # 18-23, at 4; Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 11), but she does not provide a coherent argument regarding this issue in her response to the motion for summary judgment, nor has she submitted an alternate scale of percentages for the court to consider.  As a result, the court accepts ECU's version of this fact.

Abdel-Rahman Aff. ¶ 13; D. Taylor Aff. ¶ 13; M. Dar Aff. ¶ 11; ECU's Mot. Summ. J., Exs. 3-7, DE ## 37-10 through 37-14.)  Under departmental guidelines, plaintiff was expected to demonstrate excellence in at least two of the categories and satisfactory performance in the third.  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 4, DE # 43-5, at 2; ECU's Mot. Summ. J., Ex. 20, DE # 37-27, at 1; D. Taylor Aff. ¶ 23.)

For the research category, by the time of her tenure review, plaintiff was expected to have published six full-length papers in peer-reviewed journals based on the work she performed at ECU.[3]  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 4, DE # 43-5, at 6; ECU's Mot. Summ. J., Ex. 20, DE # 37-27, at 5; D. Taylor Aff. ¶ 23; A. Abdel-Rahman Aff. ¶ 13.)  Plaintiff also needed to successfully generate external funding, *e.g.*, federal grants from the National Institutes of Health and private grants from companies, to support her research and laboratory for a minimum of three years.  (Id.)

The department chair, David Taylor ("Taylor"), prepared annual "progress toward tenure letters" for plaintiff.  (D. Taylor Aff. ¶ 15.)  In September 2002, Taylor expressed concern about plaintiff's progress toward tenure, noting that she had published no papers.  (ECU's Mot. Summ. J., Ex. 3, DE # 37-10, at 2; D. Taylor Aff. ¶ 16.)  By academic year 2002-2003, plaintiff's progress toward tenure was "a growing source of serious concern."  (ECU's Mot. Summ. J., Ex. 4, DE # 37-11, at 2; D. Taylor Aff. ¶ 16.)  She had not published any papers, and she had not submitted any grant applications for extramural funding.  (Id.)  Although she had obtained some internal support for her research, plaintiff was informed that her "ability to be successful in the

_____

[3] Although the tenure guidelines did not "set an absolute minimum level of productivity," "6 full length papers in referred national and/or international scientific journals based on work conducted in the candidate's laboratory at [ECU was] a practical expectation."  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 4, DE # 43-5, at 6; ECU's Mot. Summ. J., Ex. 20, DE # 37-27, at 5.)

3

promotion and tenure process could be in serious jeopardy unless there [was a] significant increase in effort and success devoted to research and creative activity." (Id.)

Although plaintiff's productivity improved during academic years 2003-2004 and 2004-2005, it was still a significant "source of concern." (D. Taylor Aff. ¶ 17; ECU's Mot. Summ. J., Ex. 5, DE # 37-12, at 2; ECU's Mot. Summ. J., Ex. 6, DE # 37-13, at 2.) Plaintiff published one paper each year, but still secured no external funding. (Id.)

In April 2005, plaintiff requested a one-year extension of her probationary term, "to comply with the internal requirements of the Department of Pharmacology and Toxicology for tenure and promotion." (ECU's Mot. Summ. J., Ex. 8, DE # 37-15; see also A. Abdel-Rahman Aff. ¶ 11; D. Taylor Aff. ¶ 7.) The department's tenure and promotion committee, consisting of professors M. Saeed Dar ("Dar"), Brian McMillen ("McMillen"), and chair Abdel Abdel-Rahman ("Abdel-Rahman"), considered plaintiff's request. (A. Abdel-Rahman Aff. ¶¶ 8, 11.) Although the request was unprecedented in the history of the department, the committee unanimously voted to support the extension. (ECU's Mot. Summ. J., Ex. 9, DE # 37-16; A. Abdel-Rahman Aff. ¶ 11; D. Taylor Aff. ¶ 7.) Taylor, the department chair, also supported the extension. (D. Taylor Aff. ¶ 7.) In May 2005, ECU granted the extension, extending plaintiff's probationary term by a year and delaying tenure consideration until the 2006-2007 academic year. (ECU's Mot. Summ. J., Ex. 10, DE # 37-17; D. Taylor Aff. ¶ 7.)

In March 2006, pursuant to ECU's tenure guidelines and the ECU Faculty Manual, plaintiff provided the names and addresses of several external peer reviewers to Abdel-Rahman. (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 5, DE # 43-6; ECU's Mot. Summ. J., Ex. 20, DE # 37-27, at

4

5; ECU's Mot. Summ. J., Ex. 18, DE # 37-25, at 16.)  The external peer reviewers were

individuals who were not affiliated with ECU but who were in a position to evaluate plaintiff's

research productivity and scholarly work.  (Id.)  The department's tenure and promotion

committee compiled a separate list of external reviewers.  (Pl.'s Aff. Resp. Mot. Summ. J., DE #

43, at 5; A. Abdel-Rahman Aff. ¶ 9; D. Taylor Aff. ¶ 18.)  As department chair, Taylor then

solicited several external reviewers from the two lists to evaluate the quality of plaintiff's

research and scholarly activity.  (D. Taylor Aff. ¶ 18.)  Plaintiff received very positive reviews

from the external peer reviewers.  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 6, DE # 43-7.)  The

external reviewers "expressed their unanimous high regard for [plaintiff's] research

accomplishments, publications and grant proposals and their strong support of [plaintiff's]

candidacy."  (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 6-7.)

        The department's tenure and promotion committee examined plaintiff's application for

tenure and promotion in November 2006.  (A. Abdel-Rahman Aff. ¶ 12.)  All three members of

the committee agreed that her service was satisfactory.  (M. Dar Aff. ¶ 12; B. McMillen Aff., DE

# 37-7, ¶ 13; A. Abdel-Rahman Aff. ¶ 14.)  Dar and McMillen thought that her teaching was

satisfactory, while Abdel-Rahman had concerns.  (Id.)  For research, the most important criteria,

all three agreed that plaintiff failed to meet the tenure expectations.  (M. Dar Aff. ¶ 12; B.

McMillen Aff. ¶ 14; A. Abdel-Rahman Aff. ¶¶ 13–14.)  They thought that plaintiff's two

publications were of high quality and were willing to double their value to count as four papers,

but plaintiff still fell short of the expectation of six published papers.  (M. Dar Aff. ¶ 12; B.

McMillen Aff. ¶ 14; ECU's Mot. Summ. J., Ex. 20, DE # 37-27, at 5.)  She had also failed to

secure any external funding, even though she had been expected to obtain such funding to

support her research for a minimum of three years. (Id.) The tenure and promotion committee found plaintiff's research program to be "plainly insufficient." (B. McMillen Aff. ¶ 14; see also M. Dar Aff. ¶ 12; A. Abdel-Rahman Aff. ¶ 14.) On 6 November 2006, the members of the committee unanimously voted to recommend against tenure and promotion. (Pl.'s Aff. Resp. Mot. Summ. J., Exs. 7-8, DE ## 43-8, 43-9; ECU's Mot. Summ. J., Ex. 11, DE # 37-18; A. Abdel-Rahman Aff. ¶ 15.)

After the departmental committee voted, plaintiff sought to add material to her personnel action dossier, including a list of her grant applications to the National Institutes of Health and the National Science Foundation. (D. Taylor Aff. ¶ 21; ECU's Mot. Summ. J., Ex. 12, DE # 37-19.) The committee reconsidered her candidacy in light of this material and returned the same recommendation. (D. Taylor Aff. ¶ 21; ECU's Mot. Summ. J., Exs. 13-15, DE ## 37-20, 37-21, 37-22.)

Following the departmental committee's decision, department chair Taylor considered plaintiff's application for tenure and promotion. (D. Taylor Aff. ¶¶ 22, 24.) He found her service satisfactory but determined that her teaching was not satisfactory. (Id. ¶ 24.) Taylor also found plaintiff's research program to be minimally productive with little promise for future success. (Id.) She did not meet the expectations relating to published papers and external grants, and she did not show excellence in any of the areas of service, teaching, or research. (Id. ¶¶ 24-25.) Comparing the department's guidelines against plaintiff's lack of productivity over seven years, Taylor determined that plaintiff was not a strong candidate and that she did not meet the standards for tenure and promotion. (Id.) Taylor made his recommendation against tenure and promotion to the Interim Dean of the BSOM on 6 December 2006. (Id. ¶ 25; ECU's Mot.

6

Summ. J., Ex. 16, DE # 37-23; Pl.'s Aff. Resp. Mot. Summ. J., Exs. 9-10, DE ## 43-10, 43-11.)

Plaintiff's candidacy for tenure and promotion was subsequently considered by the BSOM school-wide Tenure and Promotions Committee, consisting of nine tenured faculty members from across the various BSOM departments. (K. Hewan-Lowe Aff., DE # 37-3, ¶ 5.) The school-wide committee makes its recommendations on candidates independently from those of the department, and the committee is charged with making an unbiased and fair determination. (Id. ¶ 9; P. Horns Aff. ¶ 18.) For the 2006-2007 academic year, the school-wide committee reviewing plaintiff's application consisted of three women and six men. (K. Hewan-Lowe Aff. ¶ 10; P. Horns Aff. ¶ 18.) After reviewing plaintiff's candidacy, the school-wide committee found significant problems with her productivity as a researcher and lack of external funding. (K. Hewan-Lowe Aff. ¶ 14.) On 25 January 2007, the school-wide committee made a unanimous recommendation to Phyllis Horns ("Horns"), the Interim Dean of the BSOM, to deny tenure and promotion. (Id. ¶ 15; P. Horns Aff. ¶ 6.)

Horns concurrently served as Interim Vice Chancellor for Health Sciences, which oversees the BSOM. (P. Horns Aff. ¶¶ 4-5, 7.) In her role as Interim Vice Chancellor, and now permanent Vice Chancellor, Horns considers the tenure applications of all candidates from the BSOM. (Id. ¶¶ 4, 12.) If she concurs with a recommendation to grant tenure and promotion, that decision is forwarded to the Chancellor for further consideration. (Id. ¶ 13.) On the other hand, if Horns agrees with a recommendation not to confer tenure and promotion, then her decision is final. (Id. ¶ 14.)

Horns considered plaintiff's candidacy, and she determined that plaintiff's teaching and service were adequate. (Id. ¶ 19.) However, she found that plaintiff "did not come close to

7

meeting the standards for research." (Id.)  As a result of her review, Horns concluded that

plaintiff did not meet the requirements for tenure and promotion.  (Id. ¶ 20.)  Horns gave due

consideration to the unanimous recommendations made earlier in the process, but the decision to

deny tenure and promotion was her own.  (Id. ¶¶ 18-19.)  Horns found that "[t]he decision to

deny tenure and promotion to [plaintiff] was fairly easy.  She was not a strong candidate." (Id. ¶

21.)  By letter dated 8 March 2007, Horns informed plaintiff of her decision.  (Id. ¶ 23; ECU's

Mot. Summ. J., Ex. 17, DE # 37-24; Pl.'s Aff. Resp. Mot. Summ. J., Ex. 15, DE # 43-16.)

Alleging gender discrimination, plaintiff appealed the denial of tenure and promotion to a

faculty hearing committee.  (Pl.'s Aff. Resp. Mot. Summ. J., DE # 43, at 15; D. Taylor Aff. ¶

51.)  After a two-day hearing in June 2007, the committee found that the evidence did not

support plaintiff's allegations of gender discrimination and personal malice.  (D. Taylor Aff. ¶

51.)  On 17 August 2007, the Chancellor notified plaintiff that ECU would not conduct further

review of the decision to deny tenure and promotion.  (Id.)  Plaintiff then appealed to the Board

of Governors for the University of North Carolina, which set aside ECU's decision and directed

ECU to have a second hearing focusing on the allegations of gender discrimination and bias.  (Id.

¶ 52; Compl. ¶ 5.j.)  Plaintiff also filed a charge of discrimination with the Equal Employment

Opportunity Commission ("EEOC") on 27 August 2007.  (EEOC charge, DE # 10-2, at 1-2.)

On 29 February and 1 March 2008, ECU held a second faculty hearing, which concluded

that plaintiff's allegations were unfounded.  (D. Taylor Aff. ¶ 52.)  Plaintiff appealed again to the

Board of Governors for the University of North Carolina, which upheld ECU's decision on 14

November 2008.  (Id. ¶ 53; Compl. ¶ 5.j.)  Plaintiff left ECU on 30 June 2008 at the expiration of

her probationary term.  (D. Taylor Aff. ¶ 55; Compl. ¶ 6.)  On 30 September 2008, the EEOC

issued plaintiff a right-to-sue letter with respect to her charge of discrimination. (Right-to-Sue Letter, DE # 10-2, at 3.)

Plaintiff filed her *pro se* complaint in this action on 24 December 2008, claiming that ECU violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. She alleges that ECU discriminated against her on the basis of her sex when it denied her tenure and promotion. She also asserts a hostile work environment claim against ECU. Plaintiff further alleges that ECU retaliated against her for filing a discrimination charge with the EEOC by giving her a poor annual evaluation.

ECU filed a motion for summary judgment on 1 December 2010. Plaintiff filed a response on 31 January 2011.[4] ECU filed a reply on 14 February 2011, and plaintiff filed a surreply on 2 March 2011. ECU filed a motion to strike plaintiff's surreply on 4 March 2011.

## II. DISCUSSION

A.     Motion to Strike Surreply

The court will first address ECU's motion to strike plaintiff's surreply. (DE # 50.) On 2 March 2011, without asking or receiving permission to do so, plaintiff filed her "Brief in Response to Defendant's Reply Brief for Summary Judgment," which is a surreply. (DE # 48.) She also attached 68 pages of documents to her brief as exhibits. ECU contends that plaintiff's surreply is improper.

Neither the Federal Rules of Civil Procedure nor this court's local rules of procedure

---

[4] ECU appears to imply that plaintiff's affidavit in response to the motion for summary judgment should not be considered because it was not notarized, it was filed late, and it exceeds the length limitations provided in Local Civil Rule 7.2(e). (See ECU's Summ. J. Reply Br., DE # 47, at 1 & n.1.) In construing plaintiff's pleadings, the court is mindful of her *pro se* status. The court construes her pleadings liberally and holds them to a "less stringent standard" than pleadings drafted by lawyers in accordance with Haines v. Kerner, 404 U.S. 519, 520 (1972). As a result, in ruling on ECU's motion for summary judgment, the court has considered plaintiff's response despite its alleged deficiencies.

9

provide for the filing of surreply briefs.  <u>See</u> Local Civil Rule 7.1 (proper motion practice consists only of a motion and an accompanying supporting memorandum, a response, and a reply, and reply briefs are discouraged); <u>Freeman v. City of Fayetteville</u>, 971 F. Supp. 971, 973 n.1 (E.D.N.C. 1997) ("The Local Rules of this court do not allow for the submission of sur-replies.").  Thus, courts generally allow a party to file a surreply "only when fairness dictates based on new arguments raised in the previous reply."  <u>DiPaulo v. Potter</u>, 733 F. Supp. 2d 666, 670 (M.D.N.C. 2010).

Here, plaintiff did not ask for leave of court to file her surreply brief, nor did she argue that a surreply brief was necessary under the circumstances of the case.  Plaintiff has also not shown that ECU presented new material in its reply brief that it had not included in the original motion for summary judgment.  Thus, the court finds that plaintiff's surreply brief is improper. However, it is not necessary to strike the surreply from the record.  Rather, the court will simply not consider the surreply or the attached exhibits in ruling on the motion for summary judgment. <u>See</u> <u>id.</u>

 B.    <u>Summary Judgment Standard</u>

The court will now address ECU's summary judgment motion.  Summary judgment is proper only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law."  <u>Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.</u>, 6 F.3d 211, 214 (4th Cir. 1993).  "[T]he substantive law will identify which facts are material.  Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  The moving party has the burden to show an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must then demonstrate that a triable issue of fact exists; she may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248.  A mere scintilla of evidence supporting the case is insufficient.  Id. at 252.  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."  Teamsters Joint Council No. 83 v. Centra, Inc., 947 F.2d 115, 119 (4th Cir. 1991).

C.    Denial of Tenure and Promotion

Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1).  In this case, plaintiff alleges that ECU discriminated against her on the basis of her sex in denying her tenure and promotion.

The court notes at the outset that federal courts review university tenure and promotion decisions "with great trepidation," consistently applying "reticence and restraint" in reviewing such decisions.  Jiminez v. Mary Wash. Coll., 57 F.3d 369, 376, 377 (4th Cir. 1995).  Courts "do

not sit as a super personnel council" to review these decisions, id. at 376 (citation and internal quotation marks omitted), and they are reluctant to interfere with the "subjective and scholarly judgments" made in reaching those decisions.  Smith v. Univ. of N.C., 632 F.2d 316, 345 (4th Cir. 1980).

> [C]ourts must be vigilant not to intrude into [tenure] determination[s], and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.  Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professional, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

Jiminez, 57 F.3d at 377 (alterations in original) (quoting Kunda v. Muhlenberg Coll., 621 F.2d 532, 548 (3d Cir. 1980)).  Title VII "is not a medium through which the judiciary may impose professorial employment decisions on academic institutions."  Id.

Here, plaintiff has submitted no direct evidence to show that the denial of tenure and promotion by ECU was the product of sex discrimination.  She cannot point to any direct statements by any of the individuals involved in this case which show that they made their recommendations or decisions regarding the denial of tenure and promotion on the basis of her sex.  (See, e.g., Pl.'s Dep., DE # 37-34, at 71-72, 79, 81, 88.)  Furthermore, the evidence submitted by ECU demonstrates that none of the relevant decision makers in this case illegally discriminated against plaintiff.  (M. Dar Aff. ¶ 13; B. McMillen Aff. ¶¶ 12, 23; A. Abdel-Rahman Aff. ¶ 18; D. Taylor Aff. ¶ 28; K. Hewan-Lowe Aff. ¶¶ 17-18; P. Horns Aff. ¶¶ 24-26, 28.)  To the contrary, Taylor and Abdel-Rahman have both stated that plaintiff's gender was, if anything, a positive factor that worked in her favor.  (D. Taylor Aff. ¶ 28; A. Abdel-Rahman Aff. ¶ 18.)

12

Because plaintiff has not brought forth any direct evidence of discrimination, her Title VII discrimination claim must proceed under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Lightner v. City of Wilmington, N.C.</u>, 545 F.3d 260, 264-65 (4th Cir. 2008) (applying <u>McDonnell Douglas</u> framework to Title VII gender discrimination claim). Under the <u>McDonnell Douglas</u> framework:

> [T]he plaintiff-employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case "drops out of the picture" and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

<u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996) (citations omitted). At the second step, the defendant's burden is one of production, not persuasion. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993). The ultimate burden of proving that "the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Id.</u> at 507 (citation and internal quotation marks omitted). Under the <u>McDonnell Douglas</u> framework, to survive a summary judgment motion the plaintiff must develop some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action. <u>Mackey v. Shalala</u>, 360 F.3d 463, 469 (4th Cir. 2004) (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000)). If a plaintiff fails to establish a *prima facie* case of discrimination or fails to raise a genuine factual dispute about the employer's legitimate, non-discriminatory explanation for the alleged discriminatory act, the defendant is entitled to summary judgment. <u>Henson v. Liggett Grp., Inc.</u>, 61 F.3d 270, 274 (4th Cir. 1995).

To establish a *prima facie* case of discrimination, plaintiff must show by a preponderance

of the evidence that: (1) she is a member of a protected group; (2) she applied for tenure and promotion; (3) she was qualified for tenure and promotion; and (4) she was rejected under circumstances giving rise to an inference of unlawful discrimination. See Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 928 F.2d 118, 121 (4th Cir. 1991) (articulating a modified McDonnell Douglas test for establishing a *prima facie* case of discrimination in failure to promote cases); Weathers v. Univ. of N.C., No. 1:08-CV-847, 2010 WL 4791809, at *12 (M.D.N.C. Nov. 18, 2010) (applying the modified test set out in Alvarado to the tenure and promotion context); Rowe v. N.C. Agric. & Technical State Univ., 630 F. Supp. 2d 601, 607 (M.D.N.C. 2009) (same). The court will address each element in turn.

    1. Protected class and application for tenure and promotion

Plaintiff is a woman and is therefore a member of a protected class under Title VII. See Steinhauer v. DeGolier, 359 F.3d 481, 484 (7th Cir. 2004) ("The first element [of a *prima facie* sex discrimination case] is really a non-issue because everyone is male or female."). The second element of plaintiff's *prima facie* case is also met because it is undisputed that plaintiff applied for tenure and promotion.

    2. Qualification

Plaintiff must establish by a preponderance of the evidence that she was qualified for tenure and promotion. The evidence in this case shows that plaintiff produced only two published papers and completely failed to secure any external funding. (See, e.g., D. Taylor Aff. ¶ 17; Dar. Aff. ¶ 12; Pl.'s Aff. Resp. Mot. Summ. J., Ex. 6, DE # 43-7, at 20.) As a result, the departmental tenure and promotion committee, the deparment chair, the school-wide BSOM tenure and promotion committee, and Interim Vice Chancellor Horns all unanimously agreed

that plaintiff failed to meet the departmental expectations for tenure and promotion. (A. Abdel-Rahman Aff. ¶¶ 14-15; D. Taylor Aff. ¶¶ 24-25; K. Hewan-Lowe Aff. ¶¶ 14-15; P. Horns Aff. ¶ 19.) Department chair Taylor noted that plaintiff "had benefitted from almost two full years beyond the normal tenure and promotion period, and still came up far short of the expectations." (D. Taylor Aff. ¶ 24.) Similarly, Interim Vice Chancellor Horns found that plaintiff "did not come close to meeting the standards for research," which "is the most important factor for consideration of tenure and promotion." (P. Horns Aff. ¶ 19.)

Despite this evidence, plaintiff contends that she was qualified for tenure and promotion. She argues that she had a third paper "under revision" at the time that her application for tenure and promotion was reviewed. (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 7.) She also maintains that she had extramural support of her research based on "(i) the significant amount of equipment for biophysical and molecular biological experiments purchased from a research grant awarded to me and brought with me to [ECU], and (ii) the generous gift of purified signaling molecules for my research from my previous mentor, Dr. Janet Robishaw." (Id. at 9.) However, even when this evidence is considered, it is still insufficient to show that plaintiff satisfied the tenure guidelines established by ECU. Furthermore, plaintiff does not dispute that all of the external grant applications that she submitted after her arrival at ECU were denied. (See id. at 6, 9.) Thus, plaintiff has not shown that she had the research and publication record necessary for obtaining tenure.

Next, plaintiff relies very heavily on the external peer reviews that were gathered from individuals outside of ECU as part of the evaluation process to show that she was qualified for tenure and promotion. Plaintiff has submitted four external peer reviews that were very positive

in nature. (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 6, DE # 43-7.)[5] Plaintiff has also submitted the

testimony of ECU Professor Chalovich, who served as a past chair of the Tenure and Promotions

Committee in the BSOM. (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 18, DE # 44, at 104:9-17.) Dr.

Chalovich stated that "you didn't normally see four very strong [external peer review] letters"

(id. at 105:9-10) and that "[j]udging from the research, [he] would have supported" the granting

of tenure and promotion to plaintiff. (Id. at 105:18-19.)

The court acknowledges that external peer reviews can be an important part of the tenure

evaluation process and that such reviews can be used to support a *prima facie* case of

qualification. See, e.g., Lee v. Univ. of Colo., No. 06-cv-02417-EWN-BNB, 2008 WL 113843,

at *9 (D. Colo. Jan. 8, 2008) ("Where, as here, the majority of a tenure candidate's outside

reviewers support tenure, the candidate has *prima facie* proof of qualification."), aff'd, 313 Fed.

Appx. 171 (10th Cir. 2009); Aquilino v. Univ. of Kan., 83 F. Supp. 2d 1248, 1255 (D. Kan.

2000) (plaintiff's evidence was sufficient to meet her *prima facie* burden regarding her

qualifications where she was able to show that a majority of her external referees recommended

that she receive the position at issue and tenure). However, as plaintiff's own exhibit

demonstrates, the external peer reviewers in this case were asked only to assess the quality of her

scholarly work. They were not asked to evaluate any of the other factors that are considered in

making a decision regarding a candidate's qualifications for tenure and promotion. (Pl.'s Aff.

Resp. Mot. Summ. J., Ex. 6, DE # 43-7, at 1 ("You have been recommended to [ECU] as a

---

[5] For example, one reviewer stated that plaintiff "is extremely productive in terms of the quality and completeness of her published studies. It is clear that it has taken some time to establish her own laboratory and the two recent *tour-de-force* articles that were published (on a modest budget) in the last couple of years suggest that she is now on the right track as an independent investigator." (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 6, DE # 43-7, at 12-13 (emphasis in original).) Another reviewer stated that plaintiff's two publications "are in high profile journals" and that both publications "involve extensive findings using difficult techniques, and easily represent work corresponding to several publications in lesser journals." (Id. at 17.)

person who is in a position to evaluate the candidate's research productivity and scholarly work. Since promotion and conferral of tenure involve consideration of criteria that include but go beyond the above-named contribution, [ECU] do[es] not ask you to make a judgment about the promotion itself. Rather, we seek your professional judgment concerning the quality of the candidate's scholarly contributions to the discipline.").) Thus, the external peer reviewers were not in a position to assess plaintiff's teaching, service, or her ability to secure external funding. See Blasdel v. Nw. Univ., ___ F. Supp. 2d ___, No. 09-C-5576, 2011 WL 1429148, at *12 (N.D. Ill. Apr. 14, 2011) ("[L]etters of recommendation, alone, do not establish [plaintiff's] qualification. Instead, [plaintiff's] qualification for tenure is based on the distinct criteria set forth in [the university's] Handbook . . . .").

Furthermore, ECU's own professors and administrators agreed with the opinions of the external peer reviewers regarding the high quality of plaintiff's two published works. (See, e.g., P. Horns. Aff. ¶ 19.) In fact, the members of the tenure and promotion committee were willing to double the value of plaintiff's scholarly work to count as four papers. (M. Dar Aff. ¶ 12; B. McMillen Aff. ¶ 14.) Thus, the evidence does not show that ECU sought to ignore or discount favorable views of her scholarly contributions to her field, and the external peer reviewers do not override ECU's expertise and academic judgment in determining whether plaintiff was qualified for tenure.

Plaintiff also expends a considerable amount of effort attacking the process that ECU has devised for considering her application for tenure. For example, she argues that "[a]ll three members of the Tenure and Promotion Committee lack even basic understanding of the research conducted in my laboratory" and that "the [tenure] Guidelines were developed more than 20

17

years ago based on the whole animal research conducted at that time in the department." (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 7; see also Pl.'s Aff. Resp. Mot. Summ. J., DE # 43, at 14 ("Dr. Horns does not have any scientific expertise, documented by research publications, in the field of membrane biophysics and signaling, single-molecule techniques and ion channels.").) Her disapproval of ECU's tenure evaluation process, however, is not cognizable as a discrimination claim. See Rowe, 630 F. Supp. 2d at 609.[6] The court concludes that plaintiff's own personal belief that she meets all of the tenure criteria set forth by ECU cannot create a genuine issue of material fact for trial. Id.; Evans, 80 F.3d at 960-61 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (citation and internal quotation marks omitted)).

---

[6] The court notes that plaintiff has also alleged that there were some procedural irregularities in the tenure evaluation process. (See, e.g., Letter to EEOC, DE # 18-3, at 1; Pl.'s Aff. Resp. Mot. Summ. J., DE # 43, at 12 ("[T]he Tenure and Promotion Committee of the Department and Professor Taylor did not provide documents that were required by the Brody SOM Tenure and Promotion Committee."), 14; Pl.'s Aff. Resp. Mot. Summ. J., Ex. 13, DE # 43-14; Pl.'s Aff. Resp. Mot. Summ. J., Ex. 25, DE # 44-5.) However, plaintiff has not made any specific due process claims in this case. At most, plaintiff has shown that the tenure evaluation process was not perfect. "Title VII, however, does not afford plaintiff a flawless or fair tenure review process- it simply precludes the University from making an adverse tenure decision based, even in part, on plaintiff's [sex]." Babbar v. Ebadi, 36 F. Supp. 2d 1269, 1279 (D. Kan. 1998), aff'd, 216 F.3d 1086 (table), No. 99-3040, 2000 WL 702428, at *6 (10th Cir. May 26, 2000). Thus, even if ECU did not diligently follow its standard procedures in evaluating plaintiff's tenure application, such evidence does not permit an inference that plaintiff's sex was a motivating factor in ECU's tenure decision. Id.

3. <u>Whether the Circumstances Give Rise to an Inference of Unlawful Discrimination</u>

Assuming for the sake of argument that plaintiff was qualified for tenure and promotion, she also fails to provide evidence that her application for tenure and promotion was denied under circumstances giving rise to an inference of unlawful discrimination by ECU.  Plaintiff argues that an inference of unlawful sex discrimination should be drawn because she was treated differently than similarly situated male professors.  A plaintiff can present circumstantial evidence of intentional discrimination by proving that similarly situated employees outside of the protected class received systematically better treatment.  <u>See</u> <u>Haywood v. Locke</u>, 387 Fed. Appx. 355, 359 (4th Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 1491 (2011); <u>Lightner</u>, 545 F.3d at 265 (discussing Title VII disparate discipline claim); <u>Sterling v. Tenet</u>, 416 F.3d 338, 345 (4th Cir. 2005).  The Fourth Circuit Court of Appeals has noted that "[t]he similarity between comparators . . . must be clearly established in order to be meaningful."  <u>Lightner</u>, 545 F.3d at 265; <u>see</u> <u>also</u> <u>Haywood</u>, 387 Fed. Appx. at 359 ("[P]laintiffs are required to show that they are similar in all relevant respects to their comparator.").

First, plaintiff specifically argues that she was similarly situated to department chair Taylor.  She contends that they had "identical scientific expertise" and that they were "trying to develop the same contemporary scientific area in the same environment (the same department, the same university)."  (Pl.'s Aff. Resp. Mot. Summ. J., DE # 43, at 14.)  Although plaintiff had only a single collaborator working with her (<u>id.</u> at 11), she maintains that Taylor had two research assistants working with him full time since 2001.  (<u>Id.</u> at 10.)  For approximately three and a half years, Taylor also had a Research Associate Professor working with him full time.  (<u>Id.</u>)  Moreover, Taylor had two graduate students working toward their PhD degrees under his

supervision.  (Id.)  Plaintiff argues that in contrast to her two published papers, Taylor had not

generated a single independent research publication during plaintiff's time at ECU.  (Id.)

Plaintiff also states that Taylor had no extramural funding for his research.  (Id.; see also Pl.'s

Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 8.)

    The court finds that Taylor was not similarly situated to plaintiff.  In his affidavit, Taylor

states: "I am currently the Department Chair for the Department of Pharmacology and

Toxicology in the [BSOM] at [ECU].  I have been Department Chair since I started work at ECU

on January 1, 2001; I also have an appointment with tenure as Professor in the department."  (D.

Taylor Aff. ¶ 3.)  As plaintiff herself admits, Taylor "was recruited at the end of 2000, as the new

chair of the Department . . . ."  (Pl.'s Aff. Resp. Mot. Summ. J., DE # 43, at 10; see also id. at 3.)

Because Taylor has been the department chair since his arrival at ECU, it is clear that he and

plaintiff were not in the same place in their careers.  Taylor and plaintiff performed separate and

distinct roles within the department, and each had different responsibilities.  (See, e.g., Taylor

Aff. ¶ 36 ("As Department Chair, I sometimes have two research technicians, because my

administrative duties require a great deal of my time and take me away from my laboratory.").)

Thus, it is not appropriate to compare Taylor with plaintiff for the purposes of her sex

discrimination claim.  See Lightner, 545 F.3d at 265 ("The difference in the[] positions within

the [department] makes the purported comparison in this case too loose.").

    Next, plaintiff makes a more general allegation that, "compared to similarly situated male

faculty members," she did not receive "equal Departmental resources such as laboratory space,

research assistants and graduate students . . . ."  (Compl. ¶ 5.b; see also Pl.'s Aff. Resp. Mot.

Summ. J., Ex. 20, DE # 44-4, at 12-17.)  She also maintains that she was purposefully excluded

from graduate student thesis committees (Compl. ¶ 5.e; Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 15-17) and that she received less than 50 percent of the state-funded resources allocated to a similarly situated male professor in the same department. (Compl. ¶ 5.b.)

Aside from these bald allegations, plaintiff has provided very little evidence to support her position. Her complaint does not specifically name any male professors who were treated more favorably with respect to departmental resources. (See Compl. ¶¶ 5.b, 5.e.) Furthermore, plaintiff does not address this issue in the body of the affidavit that she filed in response to ECU's motion for summary judgment. After reviewing the entire record in this case, the court has determined that plaintiff is attempting to argue that Dr. Nicholas Cozzi, Dr. Ken Soderstrom ("Soderstrom"), and Dr. Gibson were treated more favorably than she was. (See, e.g., Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 13-14; Bd. Governors' Report, DE # 18-6, at 13-14; Pl.'s 3/12/08 Letter to Chancellor Ballard, DE # 18-23, at 2.) However, she has failed to demonstrate that these male professors are comparable employees who were similarly situated. Plaintiff has not shown that any of the male professors are directly comparable to her with respect to their qualifications, experience, performance, or responsibilities. Although the burden of demonstrating a *prima facie* case is not onerous, see Evans, 80 F.3d at 960, plaintiff must still establish her case by a preponderance of the evidence. See, e.g., Tarver v. Winter, 535 F. Supp. 2d 565, 572 (E.D.N.C. 2008) (discussing a discriminatory discharge claim). She has failed to meet her burden with respect to this element of her claim.

Furthermore, none of the record evidence suggests that ECU took any action against plaintiff involving laboratory space, research assistants, or graduate students due to her sex. In fact, it appears that ECU was not the actual decision maker with respect to some of the actions

about which plaintiff complains. For example, ECU has provided evidence to show that Soderstrom was able to hire an additional research technician because he secured a significant external grant that allowed him to make his own decision to expand his research program. (D. Taylor Aff. ¶¶ 36, 45.) In addition, ECU has provided evidence to show that the graduate students themselves chose which professor's laboratory they wanted to work in, and no student ever selected plaintiff's lab as his or her first choice. (M. Dar Aff. ¶¶ 21-25; Taylor Aff. ¶¶ 40-41.) The graduate students also chose the faculty members who would sit on their thesis committees, and no male or female graduate student chose plaintiff to be included on a thesis committee. (M. Dar Aff. ¶¶ 19-20; D. Taylor Aff. ¶ 42.)[7]

Moreover, the record is bereft of evidence that the ultimate decision-making party, Interim Vice Chancellor Horns, reached her decision based on anything other than academic reasons. Plaintiff indicated in her deposition that she had no evidence of an impermissible motivation on Horns' part. (Pl.'s Dep., DE # 37-34, at 84, 88.) Horns concluded that "[e]ven with almost two additional years to meet the standards, [plaintiff's] output was meager and she secured no grants." (P. Horns Aff. ¶ 19.) This opinion did not stem from any discriminatory determination. Rather, it was based on Horns' own review of plaintiff's entire body of work in combination with the review of the departmental committee, the department chair, and the school-wide Tenure and Promotions Committee. (P. Horns Aff. ¶¶ 17-20.) As a result, the court cannot find that plaintiff has advanced a *prima facie* case of discrimination.

---

[7] Plaintiff attempts to dispute this evidence by citing to ECU's Policies and Guidelines for the Doctoral Program in the Department of Pharmacology and Toxicology. (See Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 14-16.) However, the provisions cited by plaintiff merely indicate that certain members of ECU's staff were required to assist and make recommendations to the graduate students as they moved through the process of selecting their dissertation advisors and their dissertation advisory committees. The provisions do not establish that ECU was the ultimate decision maker with respect to these issues.

4. Legitimate, Non-Discriminatory Reason and Pretext

Even if the court assumes for the sake of argument that plaintiff could establish a *prima facie* case of discrimination, her claim would still fail because ECU has proffered a legitimate, non-discriminatory reason for its denial of her application for promotion and tenure. ECU concluded after a review of her application that she did not meet the requirements for promotion and tenure set forth in the Department of Pharmacology and Toxicology's tenure guidelines. The primary reasons cited for denying her tenure and promotion were her failure to publish six full-length papers in peer-reviewed journals during the probationary term and her failure to secure any external funding to support her research and laboratory. The departmental tenure and promotion committee, the department chair, and the school-wide BSOM tenure and promotion committee all found that she had insufficient accomplishments in the area of grants and publications. (A. Abdel-Rahman Aff. ¶¶ 13-14; M. Dar Aff. ¶ 12; B. McMillen Aff. ¶ 14; D. Taylor Aff. ¶ 24; K. Hewan-Lowe Aff. ¶¶ 13-14.) This conclusion was confirmed by an independent review by the Interim Vice Chancellor, who specifically noted: "[Plaintiff's] two articles did not come close to meeting the publication expectation. She also failed to secure any external funding whatsoever." (P. Horns Aff. ¶ 19.)

"It has been said that 'publish or perish' is the watchword of academia, and courts have held that a lack of publication during a professor's term of employment at a school [is] a legitimate, non-discriminatory reason for denial of tenure." Rowe, 630 F. Supp. 2d at 611; see also Weathers, 2010 WL 4791809, at *19; Rosado v. Va. Commonwealth Univ., 927 F. Supp. 917, 937 (E.D. Va. 1996) (finding that the defendant school met its burden to articulate a legitimate, non-discriminatory reason because "[t]he comments of the members of the promotion

and tenure committees reflect a reasoned decision not to promote or grant tenure based on lack of a constant and satisfactory record of research and publication"). By submitting evidence of plaintiff's limited number of publications, in addition to evidence of her failure to procure any external grants, ECU has produced specific evidence of a legitimate, nondiscriminatory reason for denying plaintiff tenure and promotion.

Under the McDonnell Douglas framework, once ECU articulates a legitimate, non-discriminatory reason for its decision to deny plaintiff's tenure and promotion application, plaintiff must come forth with evidence that the proffered reason was pretextual. This burden is met only if plaintiff proves "both that the reason was false, and that discrimination was the real reason" for the denial. Jiminez, 57 F.3d at 378 (emphasis in original) (citation and internal quotation marks omitted). Plaintiff has provided no evidence to show that the conclusion that she lacked publications and external funding was false, nor has she produced any evidence of a discriminatory motive by anyone involved in the tenure and promotion process. Although plaintiff alleges that she endured several "direct statements indicating gender bias"[8] (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 17), these statements are insufficient to permit a reasonable inference of discriminatory animus. "[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'" Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) (some alterations in original) (citation omitted), overruled on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003); Weathers, 2010 WL 4791809, at *20.

_____

[8] The exact nature of the statements relied on by plaintiff will be described in the court's discussion of her hostile work environment claim. See Section II.D., infra.

None of the gender-based comments allegedly made by ECU faculty members related to the employment decision at issue in this case, *i.e.*, the decision to deny plaintiff tenure and promotion. Furthermore, all of the comments were made at least one year before the decision to deny plaintiff tenure, and some were made as far back as 1999 and 2002. (Compl. ¶¶ 5.f, 5.i; D. Barnes Aff., DE # 37-5, ¶ 6; M. Dar Aff. ¶¶ 6-7.) See Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir. 1994) (finding that a discriminatory statement which was made over two years before the challenged employment action was too remote to be used as evidence of discrimination); Phelps v. Yale Sec., Inc., 986 F.2d 1020, 1026 (6th Cir. 1993) (finding that because discriminatory statements were made approximately a year before the challenged employment action, they were too remote "to have influenced the termination decision"); Blasdel, 2011 WL 1429148, at *8 (statements made by faculty members failed to point directly to gender discrimination because the statements were "stray remarks, made years before, and completely unrelated to, the tenure decision"); Weathers, 2010 WL 4791809, at *20 (statements made at least one year before decision to deny tenure could not be used to establish pretext).

For the foregoing reasons, even if plaintiff could make out a *prima facie* case, ECU has offered a legitimate, nondiscriminatory reason for its decision to deny her tenure and promotion, and plaintiff has not presented any evidence to show that ECU's proffered reason is pretextual. Essentially, plaintiff is inviting this court "to reweigh the merits of [her] scholarship against its deficiencies seeking a more favorable decision from this court than from [her] colleagues." Collin v. Rectors & Visitors of Univ. of Va., 163 F.3d 598 (table), No. 96-1078, 1998 WL 637420, at *3 (4th Cir. Aug. 31, 1998). The court cannot accept this invitation. The court is not as qualified to evaluate plaintiff's tenure application in the context of the standards of the

Department of Pharmacology and Toxicology in the BSOM as ECU's own faculty. Furthermore, it is not the role of the federal court to assess the quality of a professor's scholarly work. In the absence of evidence of a discriminatory reason for the denial of tenure and promotion, there is no cause to conclude that ECU's decision was in violation of Title VII. Finding no genuine issue of material fact for trial, summary judgment will be granted in favor of ECU with respect to this claim.

D.    Hostile Work Environment

Plaintiff also asserts a hostile work environment claim against ECU. As previously noted, Title VII prohibits employers from discriminating "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). "Title VII is violated '[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (alterations in original) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The Fourth Circuit Court of Appeals employs a four-part test to evaluate whether a plaintiff has established a *prima facie* case on a hostile work environment claim. A plaintiff must demonstrate that the alleged conduct was (1) unwelcome, (2) based on her sex, (3) sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment, and (4) imputable to her employer. Id.

A hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did

perceive to be so." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998). Courts look at all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> at 787–88 (citation and internal quotation marks omitted). An actionable hostile work environment claim requires that "the harassing 'conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment.'" <u>EEOC v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir. 2008) (alterations in original) (citation omitted). "Title VII does not prohibit genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex," and "simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Faragher</u>, 524 U.S. at 788 (citation and internal quotation marks omitted).

Plaintiff bases her hostile work environment claim on the following incidents that took place starting in January 1999, prior to her being hired at ECU, and continuing until the fall of 2005: (1) during her job interview in January 1999, Dr. Donald Barnes ("Barnes") asked her whether she planned to have more children; (2) during a social gathering in fall of 1999, plaintiff asked Dar where his wife was, and he responded that in his faith (Islam), the place of a married woman was in the home; (3) in the fall of 2000, Barnes scheduled her to teach three 50-minute lectures starting four days after the due date of her second child; (4) on 23 June 2001, plaintiff discovered that the freezer where her purified signaling proteins were kept was partially unplugged; (5) in the fall of 2001, Taylor, Abdel-Rahman, and Barnes obstructed one of her lectures and made intrusive comments; (6) in the winter of 2002, Dar again told plaintiff that in

his faith the place of a married woman is in the home, which included his daughter-in-law who had a college education; and (7) in the fall of 2005, during a faculty meeting regarding the placement of one of the graduate students in the department's labs, both Soderstrom and McMillen told plaintiff that she could not handle the female graduate student because the student needed a "strong, male authoritarian figure." (See Compl. ¶¶ 5.f, 5.g, 5.h, 5.i; Pl's. Aff. Resp. Mot. Summ. J., Ex. 20, DE # 44-4, at 17-20; ECU's Mot. Summ. J., Ex. 22, DE # 37-29; D. Barnes Aff. ¶¶ 6, 8, 10; M. Dar Aff. ¶¶ 6-7; B. McMillen Aff. ¶¶ 6-7; D. Taylor Aff. ¶¶ 46-49.)

Although ECU disputes plaintiff's depiction of these events, the court accepts plaintiff's version of the facts for the purposes of the summary judgment motion. Anderson, 477 U.S. at 255. Viewing all of the alleged conduct in the light most favorable to plaintiff, she cannot demonstrate a hostile work environment. Plaintiff's claim suffers from numerous defects, not all of which are necessary to detail here. The court finds that the proffered evidence falls far short of creating an issue under the second and third elements of the four-part hostile work environment test. See Ocheltree, 335 F.3d at 331. At least two of the incidents in question (i.e., the unplugging of the freezer and the obstruction of plaintiff's lecture) have no discernible connection whatsoever to plaintiff's gender, and the evidence as a whole does not suggest a severe and pervasive environment of abuse. Plaintiff worked for ECU for almost nine years, and it is clear from the record that the comments and incidents alleged by plaintiff were relatively infrequent. The sporadic, isolated incidents of which plaintiff complains do not approach the threshold for a colorable claim of a sexually hostile work environment. See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996) ("[T]he conduct of which [plaintiff] complains, spread over seven years with significant time gaps between incidents, does not create

a sufficiently hostile environment on which to rest a Title VII claim."); Sturdivant v. Kone Inc., No. 3:09-cv-224-RJC-DCK, 2010 WL 2723729, at *13 (W.D.N.C. July 8, 2010) ("Three isolated incidents over the course of a nearly six-year term of employment with [defendant] do not amount to extreme conduct sufficient to have altered the terms and conditions of [plaintiff's] employment."), aff'd, No. 10-1887, 2011 WL 1335200 (4th Cir. Apr. 8, 2011); cf. Buckner v. General Signal Tech. Corp., 163 F. Supp. 2d 617, 624 (W.D.N.C. 2000) ("Clearly, a handful of isolated sexist remarks over a number of years, typically followed by months, if not years, of harmonious working relations, is not the 'continuing violation' which the law was intended to remedy.").  As a result, ECU is entitled to summary judgment with respect to plaintiff's hostile work environment claim.[9]

E.      Retaliation

        Plaintiff also alleges that ECU retaliated against her after she filed her charge of discrimination with the EEOC on 27 August 2007.  She argues that department chair Taylor failed to provide her with an unbiased and just annual evaluation for the academic year 2007-2008.  Specifically, she alleges that Taylor's rating of her performance as "fair"– on a scale of poor, fair, good, very good, and excellent – was done in retaliation for the filing of her EEOC charge.  (Compl. ¶¶ 8-9; Taylor Aff. ¶¶ 14, 55–56.)  Plaintiff maintains that the annual review (see Pl.'s Aff. Resp. Mot. Summ. J., DE # 44-6, at 3-5), which was performed on 16 May 2008, was an "unfair . . . . evaluation of my performance."  (Pl.'s Dep., DE # 37-34, at 112.)  She believes that she deserved a higher evaluation than the one she received.  (See Pl.'s Aff. Resp.

_____

[9] The court also notes that plaintiff admits that she was not offended by the comment made by Dar in 1999 (Pl.'s Dep., DE # 37-34, at 166) and that she did not clearly hear the comment or comments that were allegedly made during the 2001 lecture.  (Id. at 150-51.)

Mot. Summ. J., Ex. 22, DE # 44-6, at 6-8.)

Section 704 of Title VII, 42 U.S.C. § 2000e-3(a), provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge . . . under this subchapter." To establish a *prima facie* case of retaliation, a plaintiff must show (1) that she engaged in a protected activity, (2) that the employer took an adverse employment action against her, and (3) that a causal connection between the protected activity and the adverse action exists. Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004); King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir. 2003). The employee is protected "not from all retaliation, but from retaliation that produces an injury or harm[,]" and "it is important to separate significant from trivial harms." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 68 (2006). Moreover, "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. at 69.

For the purposes of Title VII, an adverse employment action is "a discriminatory act which 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (alteration in original) (internal quotation marks omitted) (quoting Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001), abrogated on other grounds, Burlington, 548 U.S. at 53). The adverse employment action must be one that "a reasonable employee" would find "materially adverse." Burlington, 548 U.S. at 68.

> A "downgrade of a performance evaluation could effect a term, condition, or
> benefit of employment" if it has a tangible effect on the terms or conditions of
> employment. Von Gunten, 243 F.3d at 867 (citing Spears v. Missouri Dep't of
> Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)). However, a poor
> performance evaluation "is actionable only where the employer subsequently uses
> the evaluation as a basis to detrimentally alter the terms or conditions of the

> recipient's employment." Spears, 210 F.3d at 854. An evaluation merely causing a loss of prestige or status is not actionable. Cossette v. Minnesota Power & Light, 188 F.3d 964, 972 (8th Cir. 1999).

Booz-Allen, 368 F.3d at 377.

Here, it is clear that the filing of plaintiff's EEOC charge constitutes a protected activity under 42 U.S.C. § 2000e–3(a). Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998). However, plaintiff cannot demonstrate a *prima facie* case of retaliation because she cannot show that ECU used the annual evaluation as a basis to detrimentally alter the terms and conditions of her employment. Plaintiff had already been denied tenure and promotion in March 2007. When she was evaluated on 16 May 2008, she was in her terminal year of employment, and her probationary contract at ECU was set to expire on 30 June 2008. (ECU's Mot. Summ. J., Ex. 10, DE # 37-17; D. Taylor Aff. ¶¶ 7, 55-56.) In the context of plaintiff's imminent departure from ECU, the annual evaluation was not an adverse employment action.

In addition, plaintiff has not alleged any harm from the annual evaluation arising outside of ECU. She interviewed and received her next job at Virginia Commonwealth University ("VCU") in July or August 2008, and she does not assert that the annual evaluation had an impact on her application. (See Pl.'s Dep., DE # 37-34, at 106.) Because she received the job at VCU, at most, plaintiff suffered a "trivial harm[]" from the annual evaluation. Burlington, 548 U.S. at 68.

Furthermore, plaintiff alleges absolutely no facts to show that a causal nexus exists between the filing of her EEOC charge and the poor performance evaluation. Plaintiff's subjective belief that the annual evaluation was motivated by retaliation (see Pl.'s Dep., DE #

37-34, at 110, 112) is insufficient to establish a material question of fact concerning ECU's motive.[10] See, e.g., Evans, 80 F.3d at 960; Abdullah v. Bd. of Governors, No. 5:03-CV-360-BR(3), 2005 WL 4436043, at *6 (E.D.N.C. Apr. 13, 2005), aff'd, 171 Fed. Appx. 990 (4th Cir. 2006) (unpublished). Accordingly, ECU is entitled to summary judgment on plaintiff's retaliation claim.

## III.  CONCLUSION

The court has considered all of the parties' arguments, the record of this matter, and the relevant legal precedent, and has concluded that there is no genuine issue of material fact to be resolved. Accordingly, ECU's motion for summary judgment (DE # 37) is GRANTED. ECU's motion to strike plaintiff's surreply (DE # 50) is DENIED. The Clerk is directed to enter judgment in favor of ECU and close the case.

This 17 June 2011.

_____
W. Earl Britt
Senior U.S. District Judge

---

[10] Even if plaintiff could establish a *prima facie* case of retaliation, ECU has produced a legitimate, non-retaliatory reason for the annual review. See Price, 380 F.3d at 212; Williams v. Cerberonics, 871 F.2d 452, 457 (4th Cir. 1989). Plaintiff failed to timely submit a required "annual report" to Taylor prior to his completion of her annual evaluation, so he collected whatever data he could. (Pl.'s Aff. Resp. Mot. Summ. J., Ex. 22, DE # 44-6, at 6; D. Taylor Aff. ¶ 55.) In addition, plaintiff declined to teach a course in the spring semester. (D. Taylor Aff. ¶ 55.) Because the quantity of her teaching was so modest, Taylor deemed her efforts to be "fair" in comparison to the entire department. (Id.) He thought that plaintiff's research was "good" because she had published one paper, but she had again failed to secure any external funding. (Id.) In his judgment, comparing plaintiff to the department as a whole, she had earned a score of "fair." (Id.) Taylor has also stated that he did not retaliate against plaintiff for filing a discrimination charge with the EEOC. (Id. ¶ 56.) Furthermore, plaintiff has not provided any evidence to show that the reasons proffered by ECU are pretextual. "[M]ere knowledge" on the part of Taylor or ECU that plaintiff filed a charge with the EEOC "is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons" for the evaluation. Cerberonics, 871 F.2d at 457.